[No. H010395. Sixth Dist. Nov. 19, 1993.]

In re SHAWN D., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
SHAWN D., Defendant and Appellant.

## COUNSEL

Marylou Hillberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant. Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ELIA, J.—Shawn D. was found to have committed burglary. (Pen. Code, §§ 459/460, subd. (a).) He was remanded to the California Youth Authority (CYA) for a maximum period of six years. On appeal, he argues that his confession should have been suppressed because it was involuntary. For reasons we shall explain, we agree. The judgment is reversed.

### Facts and Procedural Background

Henry Han lived at 680 Ann Place in Milpitas. On August 3, 1992, Han heard knocking at his front door. He went upstairs instead of answering the knock. When he walked back downstairs, he saw a shadow. Han yelled, "What are you doing here?" The intruder went out the kitchen window. When Han checked the window, he saw that the screen had been knocked out and was lying in the backyard. The intruder knocked down the fence while escaping from the backyard.

Han did not get a good look at the intruder's face. In court, Han was unable to identify appellant as the suspect. Nothing was taken from Han's house.

Detective Ron Gordon of the Milpitas Police Department was the investigating officer. On August 5, 1992, Gordon interviewed appellant about the burglary of Han's residence. Appellant's friend, Joshua, had already been arrested for the burglary.

At the time of the interrogation, appellant was 16 years old. Approximately three hours of the interview was videotaped. The final part of the

interrogation was recorded on audiotape. The videotape and audiotape are summarized below.

After obtaining background information from appellant, and learning that appellant's girlfriend was pregnant, Gordon read appellant the *Miranda* warnings. Gordon told appellant that Joshua had confessed. Gordon said Joshua had stated that appellant and Joshua had been together on the day of the burglary.

Gordon asked appellant to tell the truth. Gordon stated *that if appellant told the truth, his honesty would be noted in the police report. Gordon said that if appellant did not tell the truth, that if it turned out appellant had lied, then that fact would also be included in the police report.*

Gordon said he had had a long talk with Joshua. Gordon stated that he had also talked with other people. Gordon said that he knew what had happened. "I'm being straight with you." Gordon told appellant. "Now is the time to be truthful."

Appellant denied any wrongdoing.

Gordon left the room. When he returned, he asked about appellant's girlfriend. *Gordon said he did not want to see appellant's girlfriend get in trouble. Gordon claimed appellant was putting his girlfriend in a precarious situation.* Gordon said he knew appellant was lying. "Everything points toward Shawn." Gordon stated, "Shawn's lying to me. I was told you were going to lie, . . . deny . . . blame other people."

Gordon stated that he just wanted the stolen property returned to the burglary victims. Gordon said his job was to help get the property back. Gordon claimed that he already knew what had happened based upon statements provided by Joshua and other witnesses. Gordon asked how appellant would feel if his house was burglarized. Gordon said he just wanted appellant to apologize to the victims.

Appellant continued to deny involvement. Gordon continued to accuse appellant of lying. Gordon said that lying was like digging a hole deeper and deeper. Gordon stated that appellant would feel better if he said he was sorry. Gordon said that appellant was young and had a long life ahead of him. He said that appellant should admit his mistakes. He told appellant that it was "time to move on . . . to start a new life." Gordon said appellant should apologize, and then pursue his plan to go to trade school and become a carpenter.

Gordon stated that a witness had seen Josh and appellant. He said, "We know you and Josh did the burglaries, that's not an issue with us any-more. . . . I want to help get some of the property back. . . . *My police report will reflect if you're being cooperative with us.*"

Gordon reminded appellant that appellant's girlfriend was pregnant. He asked appellant, "What is better with a pregnant girlfriend, to be honest and get this squared away and get on with your life, or to play games?" Gordon said that if appellant continued lying he would go to the hall or to jail, and suggested that if appellant stopped lying he would be able to see his girlfriend and baby. Gordon stated, "There's a time to quit being a jerk. Face it."

Gordon told appellant a parable. He said, "You are on the toilet, you just got done taking a crap. You reach back to wipe yourself and you have this ring on, the one your girlfriend gave you. . . . She gives you a nice big wedding ring. . . . You go back to wipe yourself and the ring falls off in the toilet. Now what? . . . It's full of shit and the ring's at the bottom. Just flush the shit and ring down the drain? . . . Here's a chance to reach in the toilet, pick up your ring or you can keep on lying. . . . Flush the toilet and you're flushing away your future. . . . Flush the toilet and keep lying or be a man and reach in, and clean yourself off."

Gordon further stated, "Let me explain some things about the law and how it works." Gordon told appellant, "If you drive to a bank (you're the getaway driver), and your partner says 'I'm going to rob the bank, wait and I'll be out in a second,' and your partner goes in and robs the bank. . . . You know about it. He comes out and then you take off. Did you rob the bank?"

Appellant said, "Not really." Gordon said, "Let me explain something. You're in trouble for robbing a bank. Now, when you *explain* it, that that's what you did, *it may make a difference but until its explained, exactly what you did, you're going to be assumed to be the one that went in, just as guilty as the guy that went in.*" According to Gordon, both persons would get arrested although only one went into the bank but "it doesn't matter and you didn't tell us the truth."

Gordon later left the room. The videotape reveals that appellant was agitated. He mumbles to himself and then says "They think I'm crazy . . . going crazy . . . talking to myself."

When Gordon returned to the room, he told appellant that he had shown his picture to a witness. Gordon said the witness had seen appellant get into

Josh's car and drive away. Gordon said, "That's just one more person. . . . That toilet's full of shit right now. You've taken two craps." Gordon told appellant to "Be a man about it. Reach down and clean it off."

Appellant then admitted dropping Josh off on the morning of the burglary. Appellant continued to deny knowing about the burglary. Gordon again left the room. Alone in the room, appellant states, "I don't need to get in trouble . . . 2 years, 7 years . . . San Quentin. . . . Like father, like son. I change my life and now see what happens."

Appellant then provided Gordon with a written statement. In the statement, appellant admits dropping Josh off. When Gordon returned to the room, he read the statement. Gordon said that appellant was lying.

Gordon told appellant he had obtained a statement from appellant's girlfriend. Gordon said appellant's girlfriend had implicated appellant in the crime. Appellant then admitted being *outside* the house that had been burglarized but denied knowing about the burglary. Appellant admitted burglarizing some automobiles.

Appellant's girlfriend was brought into the interview room. Gordon left the room. Appellant asked his girlfriend what she had told the police and why. She said Gordon had told her she would be locked up and taken to jail if she did not tell what she knew.

Gordon returned. Appellant admitted driving Josh to the house which was burglarized, and admitting seeing the "Chinaman" (the resident of the house). Appellant asked if he was going to be sent to the "Hall." Gordon confirmed that appellant would be sent there pending trial. Gordon also stated that appellant could be tried as an adult and sent to state prison.

Gordon stated that they had witnesses who had seen appellant in the house. Appellant denied being in the house. Appellant claimed he had given Josh a ride, had seen the "Chinaman," became scared and left. Gordon told appellant's girlfriend that it was time for her to leave. She left with Gordon.

While Gordon was gone, appellant appeared agitated. He kicked his chair, picked it up and set it down again. A few moments later, Gordon returned to the room. He handcuffed appellant. As Gordon again left the room, he reminded appellant that he could be tried as a juvenile or an adult. If he was tried as an adult, Gordon told appellant that he would be sent to state prison. Gordon told appellant he should do something about his predicament since he had a "nice lady" and a baby on the way.

At this point the videotape ends. The final 15 to 20 minutes of interrogation was recorded on audiotape. The audiotape reveals the following.

The tape begins with two detectives, including Gordon, interrogating appellant. The officers displayed pictures of the burglarized homes, and the vandalism that occurred there. Appellant blames Josh for the vandalism but admits being inside a home that was vandalized. Appellant insists he was not in the "Chinaman's" house. Gordon said they could prove appellant was guilty simply based upon his modus operandi. Appellant admitted burglarizing a car. The officers continued asking him about the residential burglaries.

Appellant expressed concern about being tried as an adult. Gordon reminded appellant that he could be sent to state prison, CYA, or San Quentin. The officers continued questioning appellant. The other officer frequently reminded appellant that he could be tried as an adult. Gordon then told appellant, *"Seriously, you help us get the stuff back and I will personally talk to the D.A. or persons who do the juvenile."*

Subsequently, appellant admitted walking to the front of the "Chinaman's" house while Josh went inside. Appellant admitted going to the house with the intent to assist Josh in the burglary. Appellant later admitted being involved in other burglaries.

Appellant was charged with three counts of burglary (Pen. Code, §§ 459/460, subd. (a)). He was also charged with two counts of misdemeanor vandalism. (Pen. Code, § 594, subd. (b)(2).) He moved to suppress his statements to the police. According to appellant, the statements were involuntary due to police inducement, intimidation, or threats. The motion to suppress was denied.

On September 1, 1992, the jurisdictional hearing was held. Count V, which alleged that appellant had burglarized Henry Han's residence, was sustained. Appellant was committed to CYA for a maximum period of 6 years.

This appeal ensued.

### Standard of Review

Where the voluntariness of a confession is raised on appeal, the reviewing court should examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was proper. If

conflicting testimony exists, the court must accept that version of events that is most favorable to the People to the extent it is supported by the record. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 470 [276 Cal.Rptr. 356, 801 P.2d 1107].)

## Discussion

■ Appellant contends his confession was coerced. We have reviewed the videotape and audiotape. After considering the totality of the circumstances, we conclude that the confession was involuntary.

■ In general, a confession is the defendant's declaration of his or her intentional participation in a criminal act. (*People* v. *Engert* (1987) 193 Cal.App.3d 1518, 1527 [239 Cal.Rptr. 169]; *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) A confession constitutes an acknowledgment of guilt of the crime charged. (*People* v. *Kristy* (1952) 111 Cal.App.2d 695 [245 P.2d 547]; *People* v. *Kilpatrick* (1980) 105 Cal.App.3d 401, 413 [164 Cal.Rptr. 349].)

■ In order for a confession to be admissible as evidence, the confession must have been made voluntarily and without coercion. (*Brown* v. *Allen* (1953) 344 U.S. 443 [97 L.Ed. 469, 73 S.Ct. 397]; *Jackson* v. *Denno* (1964) 378 U.S. 368, 385-386 [12 L.Ed.2d 908, 920-921, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; *People* v. *Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) Admitting an involuntary confession as evidence against a defendant violates a defendant's due process rights under both the California and United States Constitutions. (*Jackson* v. *Denno*, *supra*, 378 U.S. 368; *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97].) Use of such confessions in a criminal prosecution is prohibited because "it offends 'the community's sense of fair play and decency' to convict a defendant by evidence extorted from him . . . ." (*People* v. *Atchley* (1959) 53 Cal.2d 160, 170 [346 P.2d 764].)

■ A confession is involuntary if an individual's will was overborne. (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74]; *In re J. Clyde K.* (1987) 192 Cal.App.3d 710, 720 [237 Cal.Rptr. 550].) A coerced confession is not "the product of a rational intellect and a free will." (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274].)

In deciding if a defendant's will was overborne, courts examine "all the surrounding circumstances—both the *characteristics of the accused* and the

*details of the interrogation.*" (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041]; see also *People* v. *Hogan* (1982) 31 Cal.3d 815, 841 [183 Cal.Rptr. 817, 647 P.2d 93], overruled on other grounds in *People* v. *Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Benson, supra,* 52 Cal.3d 754, 779, italics added.) ·

Characteristics of the accused which may be examined include the accused's age, sophistication, prior experience with the criminal justice system and emotional state. (*Stein* v. *New York* (1953) 346 U.S. 156, 185-186 [97 L.Ed. 1522, 1542-1543, 73 S.Ct. 1077]; *People* v. *Spears* (1991) 228 Cal.App.3d 1, 27-28 [278 Cal.Rptr. 506].)

Details of the interrogation may prove significant in deciding whether a defendant's will was overborne. For example, courts may consider whether the police lied to the defendant. "While the use of deception or communication of false information to a suspect does not alone render a resulting statement involuntary [citation], such deception is a factor which weighs against a finding of voluntariness [citation ]." (*People* v. *Hogan, supra,* 31 Cal.3d 815, 840-841.) As we stated in *People* v. *Engert, supra,* 193 Cal.App.3d 1518, "Appellant is correct that a lie told to a detainee regarding an important aspect of his case can affect the voluntariness of his confession or admission." (*Id.* at p. 1524.)

Similarly, threats or promises relating to the defendant's relatives may also cause a defendant's will to be overborne. "A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid." (*People* v. *Steger* (1976) 16 Cal.3d 539, 550 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; see also *People* v. *Barker* (1986) 182 Cal.App.3d 921, 932 [227 Cal.Rptr. 578].) However, if there is no express or implied promise made by the police, a defendant's mere belief that his or her cooperation will benefit a relative does not invalidate an admission. (*People* v. *Steger, supra,* 16 Cal.3d at p. 550; *People* v. *Montano* (1960) 184 Cal.App.2d 199, 210 [7 Cal.Rptr. 307].)

In *People* v. *Trout* (1960) 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418], the California Supreme Court invalidated a confession obtained after the police told the defendant that if he confessed his wife would be released to care for their children. In *Rogers* v. *Richmond, supra,* 365 U.S. 534, the interrogating officer threatened to arrest the defendant's wife, and told the defendant he would be "less than a man" if he allowed this to happen. Soon thereafter, the defendant confessed. The United States Supreme Court reversed and determined that the court had applied the wrong standard in analyzing the admissibility of the confession.

Finally, a confession elicited by promises of benefit or leniency is *inadmissible*. (*People* v. *Carr* (1972) 8 Cal.3d 287, 296 [104 Cal.Rptr. 705, 502 P.2d 513]; see also *In re J. Clyde K., supra*, 192 Cal.App.3d at p. 720; *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].) As this court stated in *People* v. *Sultana* (1988) 204 Cal.App.3d 511, 522 [251 Cal.Rptr. 115], " 'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency *whether express or implied*. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.' " (*Id.* at p. 522, citing *People* v. *Jimenez* (1978) 21 Cal.3d 595, 611-612 [147 Cal.Rptr. 172, 580 P.2d 672], italics added; see also *People* v. *McClary, supra*, 20 Cal.3d 218, 227-230.)

If "the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . ." (*People* v. *Jimenez, supra*, 21 Cal.3d at p. 612; see also *People* v. *Sultana, supra*, 204 Cal.App.3d at p. 522.)

In *People* v. *Brommel* (1961) 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845], the police told the suspect that unless he changed his story (he had denied beating his daughter) the police would write the word "liar" on their report to the judge. According to the court, this conduct constituted both a threat and an implied promise of leniency which rendered the subsequent confession inadmissible.

In *People* v. *McClary, supra*, 20 Cal.3d 218, the police repeatedly branded defendant a liar, told her that unless she altered her statement and admitted the true extent of her involvement, she would be charged as a principal to murder and would face the death penalty. In doing so, according to the court, "the officers strongly implied that if defendant changed her story and admitted mere 'knowledge' of the murder, she might be charged only as an accessory after the fact." (*Id.* at p. 229.)

In *People* v. *Jimenez, supra*, 21 Cal.3d 595, the police told the defendant that he could be subject to the death penalty. The defendant testified that "he was scared by this talk about the death penalty and that he made his statements to the officers because [the police] had told him that if he talked about the case, [the police] would tell the jury and the jury would go lighter on him." (*Id.* at p. 611.)

On appeal, the court concluded that defendant's confession was the result of the express promise that if he confessed the jury would treat him more

leniently. Further, the court decided that "even if we were to assume that no *express* promises to the defendant had in fact been made, our conclusion that the defendant's first confession was involuntary would remain unchanged because we believe that the confession was the result of an *implied* promise of leniency. The defendant testified and this testimony was corroborated by Sergeant Sett that the defendant was told he could get the death penalty, but that his codefendant probably would not. Sergeant Sett knew when he made this statement, as did the defendant, that it was the codefendant who had committed the murder and that the defendant had not been armed. *By telling the defendant that his codefendant probably would not get death, but that he might, Sergeant Sett's remarks carried with them the clear implication that by cooperating and telling what had actually happened, the defendant could possibly avoid getting a worse punishment than his codefendant because either the jury or court might treat him with leniency and not sentence him to death.* As the uncontradicted evidence thus clearly indicates that defendant's confession was motivated by the benefits implied in Sett's remarks, his confession must be deemed involuntary." (21 Cal.3d at p. 613, latter italics added.)

In *People* v. *Seaton* (1983) 146 Cal.App.3d 67 [194 Cal.Rptr. 33], the juvenile claimed the officer stated that if the juvenile cooperated, the officer would "let CYA know." (*Id.* at p. 74.) The officer denied making the statement. In holding that the juvenile's confession was voluntary, the court decided to accept the officer's "version of events as the version most favorable to the People and thus conclude no express threats or promises of leniency were made." (*Id.* at p. 74.) Thus, the *Seaton* court implicitly agreed that "letting CYA know" constituted a promise of leniency.

In *In re J. Clyde K.*, *supra*, 192 Cal.App.3d 710, three juveniles were stopped by police. The officers said that if the juveniles told the truth, they would get a citation but that if they lied, they would go to jail. The third juvenile confessed. He was given a citation and released. After the other two juveniles were taken to the police station, they made inculpatory statements.

On appeal, the two juveniles argued that the trial court erred in failing to suppress the confession of the third juvenile. The court agreed. It held that the third juvenile's confession was involuntary. According to the court, the confession was the result of the officer's promise of leniency rather than the juvenile's exercise of free will. (*In re J. Clyde K.*, *supra*, 192 Cal.App.3d at p. 716.)

In *People* v. *Flores* (1983) 144 Cal.App.3d 459 [192 Cal.Rptr. 772], the court stated, " 'Once a suspect has been properly advised of his rights, he

may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. . . . Yet in carrying out their interrogations *the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession.'"* (*Id.* at p. 470, quoting *People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 264-265 [169 Cal.Rptr. 497], italics added in *Flores*.)

*People* v. *Esqueda* (1993) 17 Cal.App.4th 1450 [22 Cal.Rptr.2d 126], also involved an involuntary confession. In that case, the defendant was convicted of second degree murder. On appeal, the court held that the trial court erred in admitting the taped statements of defendant's interviews with the police. In so doing, the court concluded the questioning by the police was unlawful because the police relied upon lies, trickery and threats to obtain statements from defendant. Indeed, the court found that there was "outrageous police behavior" and stated that the interrogation tactics were "so reminiscent of the police conduct in the late 1950's . . . as to cause wonder that we have come so far since then, yet progressed so little." (*Id.* at pp. 1484-1485.)

The interrogation tactics utilized by the police in *Esqueda* included questioning defendant about his family, his manhood, his religion and his Hispanic heritage. The police suggested that questioning would not cease until the defendant "gave [the police] the story they wanted." (17 Cal.App.4th at p. 1485.) "[The police] said they knew it was [defendant] and that it was only a matter of intentional or accidental killing. They told him his only way out was to say it was an accident. They implied by so saying he would not have to go to prison and would be out with his children." (*Id.* at p. 1486.) For these reasons, the appellate court held that the "interrogation [was] violative of the fundamental constitutional protections guaranteed each citizen by the Fifth and Fourteenth Amendments." (*Id.* at p. 1487.)

 Having examined the relevant legal principles, we next apply them to the facts of this case. First, we consider the characteristics of appellant. (*Schneckloth* v. *Bustamonte, supra,* 412 U.S. at p. 226 [36 L.Ed.2d at p. 862]; *People* v. *Hogan, supra,* 31 Cal.3d at p. 841; *People* v. *Spears, supra,* 228 Cal.App.3d 1, 27-28.)

At the time he was questioned, appellant was 16 years old. He had prior contact with the police but was described as "unsophisticated" and "naive" in the probation report. Appellant suffered from posttraumatic stress disorder. He had a difficult childhood which included witnessing his younger

brother being hit and killed by a speeding car. His parents blamed him for the accident.

We next consider the details of the interrogation. We will first consider aspects of the interrogation which, while troubling, are probably insufficient to demonstrate that appellant's will was overborne.

First, Officer Gordon repeatedly lied to appellant. He stated that Joshua had implicated appellant in the crimes. He claimed witnesses could identify appellant. He insisted that there already was enough evidence to convict appellant. Gordon also said appellant could be identified as the perpetrator of the burglaries because of his modus operandi.

None of these statements was true. And although police may use deceptive tactics in attempting to persuade a defendant to confess, such deception may be considered in deciding whether the totality of the circumstances indicate that the confession was involuntary. (*People* v. *Hogan, supra,* 31 Cal.3d 815, 840-841; *People* v. *Engert, supra,* 193 Cal.App.3d at p. 1524.)

In addition, the consistent reference to appellant being tried as an adult, while not untrue, was plainly misleading to a 16-year-old charged with burglary and vandalism. Appellant was charged with crimes that brought him within Welfare and Institutions Code section 707, subdivision (a). Thus, he benefited from the presumption that he was fit to be tried in juvenile court. To be tried as an adult, the prosecution would have had to prove that he was unfit.

Given the circumstances of appellant's crime, and nonviolent criminal history, it is doubtful that he would have been tried as an adult. Accordingly, it was misleading to tell appellant that he could be tried as an adult, and sent to San Quentin. The references to San Quentin were also somewhat threatening given the fact that the officers were pressuring appellant to confess. In other words, the officer implied that appellant was more likely to be sent to San Quentin if he failed to provide the police with a confession.

We are also not impressed with the police officer's parable about the wedding ring and toilet, about "being a man," and the officer's claim that appellant's girlfriend would stand to benefit if appellant confessed. With regard to the officer's parable, such "tough talk," alone, does not render appellant's confession involuntary. However, like the officer's untruths, it is a factor which we may consider in deciding whether the confession was involuntary.

The officer's references to appellant's girlfriend are more bothersome. As previously noted, the officer told appellant that he "did not want to see

[appellant's girlfriend] get into trouble." The officer stated that appellant "was putting [his girlfriend] in a precarious situation." These statements imply that appellant's girlfriend would get "into trouble" unless appellant confessed. Indeed, when appellant and his girlfriend, (also a juvenile), were left alone in the interview room, appellant asked his girlfriend what she had told the police and why. She stated that the police told her she would be "locked up" if she did not tell them what she knew. In this respect, this case is somewhat similar to *People* v. *Trout, supra,* 54 Cal.2d 576, where the police implied that defendant's wife would be released if defendant confessed. (*Id.* at p. 585.)

The aspects of the interrogation noted above—the untruths, the threat of being tried as an adult, the wedding ring parable, and the reference to appellant's girlfriend "getting in trouble"—are not commendable. However, even if these aspects together were insufficient to demonstrate that appellant's will was overborne, we would nonetheless conclude that appellant's confession was involuntary. This is because the police repeatedly suggested that appellant would be treated more leniently if he confessed. Such promises plainly render a confession inadmissible. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 612; *People* v. *Sultana, supra,* 204 Cal.App.3d at p. 522.)

At the very beginning of the interrogation, Gordon said that if appellant told the truth his honesty would be noted in Gordon's police report but that if appellant lied, the deception would also be documented. Telling appellant that his honesty would be recorded in the police report obviously implied that appellant would be treated more favorably if he told the truth. If appellant's honesty was irrelevant, why would the police tell appellant that it would be included in the police report? Any reasonable person, upon hearing the officer's statements, would conclude that he or she would benefit from having his or her honesty noted by the police. (Cf. *People* v. *Benson, supra,* 52 Cal.3d at p. 780.)

Gordon continued to suggest that appellant would be treated more leniently if he confessed. The officer stated that he knew appellant had committed the burglaries but that he just wanted to help get some of the property back. The officer told appellant, "My police report will reflect if you're being cooperative with us." In so doing, Gordon implied that if appellant "cooperated," and informed the police of the whereabouts of the property, then that fact would be noted in the police report. Again, the only reasonable implication from this statement is that appellant would receive favorable treatment in exchange for his cooperation.

Gordon also played up the fact that appellant's girlfriend was pregnant, and implied that if appellant continued lying he would go to jail but that if he

stopped lying, he would "get this squared away" and would be able to see his girlfriend and baby.

The officer also suggested that appellant would receive more lenient treatment if he "explained" his role in the burglary. The officer used a hypothetical. He said, "Let me explain some things about the law and how it works." Gordon told appellant, "If you drive to a bank (you're the getaway driver), and your partner says 'I'm going to rob the bank, wait and I'll be out in a second,' and your partner goes in and robs the bank. . . . You know about it. He comes out and then you take off. Did you rob the bank?"

Appellant said, "Not really." Gordon said, "Let me explain something. You're in trouble for robbing a bank. Now, when you *explain* it, that that's what you did, *it may make a difference but until its explained, exactly what you did, you're going to be assumed to be the one that went in, just as guilty as the guy that went in.*" According to Gordon, both persons would get arrested although only one went into the bank but "it doesn't matter and you didn't tell us the truth."

Gordon's hypothetical indicated that the getaway driver would receive favorable treatment if he or she explained his or her role in the bank robbery. Gordon said, "when you *explain* it, that that's [driving the car] what you did, *it may make a difference but until its explained, exactly what you did,* you're going to be assumed to be the one that went in [to the bank], just as guilty as the guy that went in [to the bank.]"

Besides being untrue, this plainly constituted a promise of leniency in exchange for telling "exactly what you did." Gordon led appellant to believe that a getaway driver, knowing that his partner was going to commit a robbery, was less culpable that the person who went inside the bank. Since appellant had driven Joshua to the burglary scene, Gordon's comments strongly suggested that appellant, like the getaway driver, would benefit if he provided the police with an explanation of his role.

Finally, during the audiotaped portion of the interrogation, the officers increased their pressure upon appellant. The other officer repeatedly told appellant that "you could be tried as an adult." Gordon then informed appellant, "*Seriously, you help us get the stuff back and I will personally talk to the D.A. or persons who do the juvenile.*"

As with the other comments noted above, Gordon's statement is clearly a promise that appellant will benefit from telling the police the whereabouts of the stolen property. Although Gordon did not come out and state, "If you

confess, I'll make sure you are not tried as an adult," his comments strongly implied this same meaning. There is simply no other implication to be drawn from these statements. Any reasonable person, upon hearing the comments, would believe that he or she would be treated more leniently if he or she confessed to the crimes. To suggest otherwise would be to ignore the realities of this interrogation which is recorded both on videotape and audiotape.

Although the People do not argue it, any suggestion that only express promises of a benefit render a confession involuntary must be rejected. Both the case law and common sense are to the contrary. Implied promises of leniency render a confession inadmissible. (*People* v. *Jimenez supra*, 21 Cal.3d 595, 611-612; *People* v. *Sultana, supra*, 204 Cal.App.3d 511, 522.) And for good reason. To hold otherwise would simply permit police to do indirectly what they could not do directly.

Moreover, this is not a case where there was merely one isolated instance in which the police implied that appellant would benefit from confessing. Rather, the officer continually raised this theme—from the very beginning of the interrogation—to the comments about helping the police get the property back—to the statements about appellant being able to see his girlfriend and baby—to the hypothetical about the bank robber—to Gordon's statement that, "Seriously, you help us get the stuff back and I will personally talk to the D.A. or persons who do the juvenile." The promise of leniency in exchange for a confession permeated the entire interrogation.

The People attempt to fit this case into the substantial evidence rule, arguing the trial court's determination that the confession was admissible was supported by substantial evidence. ■ Although the trial court's findings are subject to deference when there is conflicting testimony, the appellate court independently decides whether the trial court's determination of voluntariness is proper. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 470 [276 Cal.Rptr. 356, 801 P.2d 1107]; *People* v. *Jimenez, supra*, 21 Cal.3d at p. 609.) ■ In this case, unlike for example, *People* v. *Seaton, supra*, 146 Cal.App.3d 67, the testimony of the officer and juvenile about the circumstances of the interrogation did not conflict. We are not forced to choose between two different versions of the events. Instead, in our case, the interrogation itself was recorded. We have reviewed the videotape and audiotape. Based upon our review of the totality of the circumstances, and for the reasons stated above, we conclude that the appellant's confession was involuntary and therefore inadmissible.

Recently, in *People* v. *Cahill* (1993) 5 Cal.4th 478, 510 [20 Cal.Rptr.2d 582, 853 P.2d 1037], the California Supreme Court held that the erroneous

admission of a confession is *not* reversible per se. Thus, *Cahill* overruled prior cases that had held that admitting such confessions resulted in *automatic* reversal. (*Id.* at p. 509, see, e.g., *People* v. *Berve, supra,* 51 Cal.2d at p. 290; *People* v. *Trout, supra,* 54 Cal.2d at p. 585; *People* v. *McClary, supra,* 20 Cal.3d at p. 230; *People* v. *Brommel, supra,* 56 Cal.2d at p. 634; *People* v. *Jimenez, supra,* 21 Cal.3d at pp. 605-606.) Pursuant to *Cahill,* under California law, the harmless error test is used to gauge the prejudicial effect of admitting inadmissible confessions. (*People* v. *Cahill, supra,* 5 Cal.4th at pp. 509-510; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) ■ If a confession admitted in a California trial was "obtained by means that render the confession inadmissible under the federal Constitution, the prejudicial effect of the confession must be determined under the [harmless-beyond-a-reasonable-doubt] standard." (*People* v. *Cahill, supra,* 5 Cal.4th at p. 510; *Arizona* v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246].)

■ In this case, there is no evidence to connect appellant to the burglary other than appellant's confession. Nothing else links appellant to the burglary of the Han residence. Thus, under *either* standard, the error in admitting appellant's confession must be deemed prejudicial.

For these reasons, the judgment is reversed.

Premo, Acting P. J., and Wunderlich, J., concurred.