Filed 4/9/15  In re Michael F. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MICHAEL F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL F.,<br><br>        Defendant and Appellant. | A140139<br><br>(San Francisco County<br>Super. Ct. No. JW13-6004) |

**INTRODUCTION**

Defendant Michael F. was among a group of people who attacked an unsuspecting victim on a San Francisco Muni bus and stole his cell phone.  The District Attorney filed a wardship petition alleging that Michael and another individual (Damien W.) committed first degree robbery (Pen. Code, § 212.5, subd. (a))[1] and personally inflicted great bodily injury in the commission of the offense (§ 12022.7, subd. (a)).  Following a contested jurisdictional hearing pursuant to Welfare and Institutions Code section 602, the juvenile court found the allegations true.  Michael was declared a ward of the court, placed on probation, and committed to Log Cabin Ranch.  Michael now argues that the statements he made to the police were involuntary and should have been suppressed, and that substantial evidence does not support the finding that he personally inflicted great bodily

_____

[1] All statutory references are to the Penal Code unless otherwise noted.

1

injury on the victim. We conclude that Michael's statements to the police were voluntary. However, we agree that substantial evidence does not support the finding that he personally inflicted great bodily injury.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 30, 2013, at about 6:00 p.m., Nathan Tatterson was riding a San Francisco Muni bus. He sat in the second to the last row, next to the right side window. Tatterson was alone, holding his cell phone on his lap and texting a friend. A group of 10 or 15 people boarded the bus together. One of that group, later identified as defendant Michael F., sat next to him. About four or five minutes later, someone seated behind Tatterson on his right hand side reached over and grabbed his phone. Tatterson turned to the right, in the direction of the person who had taken his phone, and tried to grab it back. When he turned around he saw that the row behind him was full. Someone—he wasn't sure who—punched him in the left side of his face from the side.

Tatterson described the subsequent attack, which lasted about 10 seconds: "They continued to punch me over and over again. They pushed me up against the window while punching me. They eventually got me down on the ground where they proceeded to kick me and also punch me." He was face down when the attack occurred. He was hit and kicked on his face and his back and the upper part of the body. The kicks were mostly to his back. At the end of the attack, he was kicked in the head.

The bus driver stopped the bus and opened the back door. Tatterson's attackers got off the bus and "scattered." The last person to exit the bus took Tatterson's wallet out of his back pocket. When he tried to get it back, the person kicked Tatterson in the face "very violent[ly]" and "very hard."

During the attack, Tatterson felt scared and confused. The whole incident happened so quickly that for the first couple of seconds he did not know what was happening.

Tatterson was taken to the hospital by ambulance. On a scale of 1 to 10, Tatterson rated his pain as a 10, the most severe. His left eye was swollen, he had a "big knot" and a gash on the right side of his forehead, a gash under his left eye and numerous cuts

around his face.  His back and shoulder were bruised.  Among other things, he had pain to his head for a week or a week and a half.  He rated that pain as a "ten" on the day of the attack and on the next day, as well.

At trial, the prosecution played a San Francisco Muni security camera video that captured the incident.  The video showed Tatterson sitting in the second to last row of the bus by the window on the right side.  The group that attacked Tatterson was seen getting on the bus, and a man was seen taking Tatterson's phone.  The video depicted the theft of Tatterson's phone and his beating.

Tatterson was not able to identify Michael's role in the attack, nor did he know how many people in the group that boarded the bus together attacked him.

Michael's counsel made an "oral motion in limine" at the outset of the trial to have the statements Michael gave to the San Francisco Police Department stricken on the ground that the interview was "coercive and involuntary."  In particular, Michael's counsel argued that Michael had asked to speak to his parent and that the request was denied.  In addition, counsel argued that the "advisement is very perfunctory" and it was followed by "very coercive implied promises, threats, and misrepresentations" designed to secure admissions beyond what he volunteered regarding the incident on the bus.  The hearing on the voluntariness of Michael's statements was held contemporaneously with the trial.

Michael Young, a San Francisco police sergeant who investigated the attack, identified Michael in court as a suspect he and San Francisco Police Officer Dunne interviewed the day after the attack.  Young testified about the circumstances of the interview, and some of the statements Michael made to the police officers.  The interview took place at 4:25 p.m. at the police station where Michael was in custody.  Young informed Michael, who was then about 17, of his *Miranda*[2] rights by reading verbatim from a police department issued card, and Michael answered in the affirmative as to each question regarding whether he understood his rights.  The entire interview lasted about 15

---

[2]*Miranda v. Arizona* (1966) 384 U.S. 436.

3

minutes.  Michael did not appear to have any difficulty understanding what Young was saying.  Young asked Michael some general background questions, and Michael told Young that he had been arrested before "on a cell phone caper."

Young told Michael that they had a video of the incident.  Either Young or Dunne asked Michael if he had been on the bus, when and with whom.  Michael said he had been on the bus, sitting next to the victim, and stated that he hit the victim once.  He either used the word "hit" or "punch" to describe the attack; Young couldn't remember.  When Young asked why he did this, Michael responded with the term " 'as a tag along' " which, according to Young, meant that "everybody else was doing it, so he participated also."  Later in the interview, according to Young, Michael said that during the attack " '[e]verybody was swinging and all over the place kind of swinging wildly.' "  But he also told Young that " 'maybe I didn't hit him.' "

Young testified that Michael did not ask to speak with his mother before the interview started, and no other law enforcement personnel told Young that he had done so.  Young believed Michael was "willing to cooperate and participate in the interview" because he willingly answered Young's initial questions.

At the close of evidence and after argument by counsel, the court denied the motion to exclude Michael's statement, finding "[t]here is no evidence whatsoever of any police coercion.  I find that the minor was properly advised of his *Miranda* rights, waived those rights, and voluntarily gave his statement to the sergeant."

The court found that the People had proven beyond a reasonable doubt that Michael had committed first degree robbery and found the great bodily injury allegation true beyond a reasonable doubt.  The juvenile court declared Michael a ward of the court, and placed him on probation with conditions that included that he successfully complete the Log Cabin Ranch school.  Michael's maximum term of confinement was set at nine years and eight months.  The term of confinement included eight months for two misdemeanors that were the subject of two other juvenile wardship petitions which Michael resolved by plea agreements.

This timely appeal followed.

## DISCUSSION

A. *Defendant's Statements to the Police Were Voluntary.*

Michael's counsel sought to suppress Michael's statements to the police on the ground that they were involuntary. Counsel characterized the interview to the juvenile court in this way: "there's a very coercive tone to the police questioning in this interview throughout the interview—not just at the advisement—telling the minor, for example, that they had seen him on the video. Already telling him that he was going to be charged with aggravated assault which would add a mandatory five years to his charges. Telling him that this would be his last chance to tell his side of the story and continually asking him the same questions when he had already responded." Counsel acknowledged that Michael had been a subject of a prior petition, but argued that didn't "necessarily establish[] any sophistication with respect to his rights to remain silent or his right to consult with an attorney."

In determining whether a confession was voluntary, the court examines " 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' [Citations.] [¶] Characteristics of the accused which may be examined include the accused's age, sophistication, prior experience with the criminal justice system and emotional state. [Citations.]" (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 208-209.) The People have the burden of proving the voluntariness of a confession by a preponderance of the evidence. (*People v. Sapp* (2003) 31 Cal.4th 240, 267; *People v. Markham* (1989) 49 Cal.3d 63, 71.)

Whether a confession is voluntary is " 'a mixed question of law and fact that is nevertheless predominantly legal . . . .' [Citation.] Hence ' "[o]n appeal, the determination of a trial court as to the ultimate issue of the voluntariness of a confession is reviewed independently . . . . [¶] The trial court's determinations concerning whether coercive police activity was present, whether certain conduct constituted a promise and, if

5

so, whether it operated as an inducement, are apparently subject to independent review as well." [Citation.] However, "the trial court's findings as to the circumstances surrounding the confession—including 'the characteristics of the accused and the details of the interrogation' [citation]—are clearly subject to review for substantial evidence. . . ." ' [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 296.)

Michael argues that his confession was involuntary because it was the result of "coercion, deception, and implied promises of leniency," which were made more coercive because he was a juvenile. We disagree.

We note at the outset that Michael's interview, although audio taped and made a part of the record on appeal, was never transcribed. The Attorney General quotes at length from portions of the interview, devoting about 7 and a half pages of respondent's brief to a transcription of pertinent passages. Defendant does not contest the accuracy of these transcriptions. Accordingly, when we quote at length from the interview in this section of our opinion, the quotations are from the transcription in the Attorney General's brief. We also have listened to the entire audio tape of the interview to determine whether Michael's statements, as testified to by Sergeant Young at trial, are voluntary and admissible.

At the start of the interview, Young read Michael his *Miranda* rights, and Michael acknowledged understanding each of his rights. Young asked Michael about a prior arrest. Michael acknowledged he had been in court a week earlier regarding an incident in which he "snatched" a phone. Michael stated that he had been placed on informal probation for that charge.

Young asked Michael where he went to school and started to ask him who he was "hanging out with" when he was stopped by the police. At that point, Officer Dunne, who was also in the room, interrupted and told Michael that he had been on the phone with Michael's mother, who was "crying again. . . ." Dunne told Michael that although he had seen Michael laughing and joking, he could also "tell by the look in your face that

6

you know that you're here for something more serious . . . ." He then exhorted Michael to "give us your side of the story. What happened yesterday? And don't tell me you don't know anything about it . . . because that's just going to make it worse for you. It's just going to make it worse for you. This is your time to tell your side of the story. Your boys are not going to protect you. . . . This is your opportunity to tell us your side of the story cause I know what happened. Sarge knows what happened." Michael retorted, "You know what happened to me, why should I tell you about it?"

Young then told Michael that he had spoken to the victim, and had watched the San Francisco Muni video of the incident. He also told Michael "for your own sake, when I go to the District Attorney and talk to them and say hey, this is what happened, however, this is what [Michael] was saying. It's not what appears to be on the video. He wasn't even involved. He . . . wasn't planning even to be a part of any of this. But if I don't have your side, your version, I can't say any of that. And all I have to do is show them the video and they can decide what they want. So this is your opportunity to say what's going on." Michael responded "I know what's going on so, thanks for asking."

Dunne then told Michael that what he'd done on the bus wasn't just a "beating up." He told Michael that he was "going to sit down for this . . . ." and that there was a "charge for aggravated assault on a Muni bus" that carried with it "an automatic five-year enhancement." He told Michael he didn't think he was a "bad guy" and that he had been speaking to Michael's mother who was worried that Michael might have been dead. At this point, Dunne told Michael that he had seen the video and that "you're 16, 17 years old, we are still going to treat you like a grown man, so you're a grown man. This is your opportunity to say, hey, look this is what happened. . . ." After urging Michael to tell his side of the story, he said "you're stuck dude, there's no way out of this one. But you can help yourself by telling your side of the story. And I'm telling you, dude, you're going to sit down and you're going to wish you didn't. But you're going to wish you did when

7

you're sitting down there. I should have . . . told them my side of the story. You don't bail out of YGC. Something like this the judge doesn't release you . . . ."

Young stated that he and Dunne had both watched the video. He told Michael that "[w]e both know what you did and what you didn't do. . . . I know your involvement was minimal." Young and Dunne told Michael that they knew what Michael and his friends were going to be charged with. Young pointed out that there wasn't any way to differentiate Michael from anyone else if he didn't tell them what he'd done. Michael pointed out that Young must know what he had done because he'd seen him on the video.

Young told Michael that he and his friends were all going to be treated the same and implied that the way for Michael to avoid this was to explain why his involvement had been less serious. Dunne then asked "How many times did you hit him?" At that point, Michael replied "I only hit him one time. I barely even hit him cause there was hella people hitting him. There was hella people hitting him." Michael then described the incident, and in answer to a question about why he had hit Tatterson, he replied "[t]o tag along. . . . [¶] . . . It just popped up and I just tagged along." After Michael described his involvement in the attack, he responded further to Young and Dunne's questions about the details of the incident. He again stated that "I only hit him one time. . . . [¶] I barely got to—I don't even know I hit him. There was hecka people hitting. I just swung."

Michael argues that the interrogation involved promises of lenience that in light of his "young age and inexperience" rendered his statements involuntary. We disagree. A confession obtained in reliance on promises of benefit or leniency, express or implied, is involuntary. (*Shawn D., supra,* 20 Cal.App.4th at p. 210.) However "mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. [Citation.]" (*People v. Jimenez* (1978) 21 Cal.3d 595, 611), overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17.) Further, the law

8

makes a distinction between pointing out that certain benefits to a defendant might "flow[] naturally" from telling the truth and a situation in which the police lead a defendant to believe that " 'he might reasonably expect benefits in the nature of more lenient treatment' " for speaking truthfully. (*People v. Jimenez.* at pp. 611-612.)

Here, neither Dunne nor Young suggested that Michael could "reasonably expect" to receive more lenient treatment for answering their questions. Instead, their statements to Michael were couched in the language of advice and exhortation. Michael was told that denying involvement would "just . . . make it worse" for him and instead "[t]his is your time to tell your side of the story. . . . This is your opportunity . . . ." He was told "for [his] own sake" it would be helpful for them to be able to tell the District Attorney what had happened was not "what appears to be on the video." Young told Michael that if he had exonerating information about the incident, he should tell them his "side" so they could convey this to the District Attorney. Young did not suggest Michael would receive more lenient treatment for telling the truth, but only told him why it was advisable to tell the truth. There is nothing impermissible about such a statement. (*People v. Higareda* (1994) 24 Cal.App.4th 1399, 1409 [when police told defendant they would talk to district attorney if he told them truth about event, ensuing confession not involuntary].)

The facts that Michael was 17 at the time of the interview and, as Michael argues on appeal, that he was "struggling in school" and with "limited experience with the criminal justice system," does not alter our conclusion. The interrogation lasted for only 15-20 minutes, and there is no evidence that Michael was tired or confused or didn't understand.[3] To the contrary, his responses indicate that he was savvy in the face of the

---

[3] On appeal, counsel for Michael contends that Michael seemed not to understand the question as to where he "resided," only answering it when it was rephrased as where did he "live." This is the only example of something Michael didn't understand; its triviality underscores the weakness of this argument.

officers' questions. For example, when Young urged Michael to tell him what he had done (as opposed to what the other youth on the bus had done) during the attack, Michael responded assertively, "You know what I did. You've seen me on the video, didn't you?" Further, he steadfastly refused to identify any of the people he was with that day or to state what led to the robbery and attack. His consistent ability to parry questions, and his obvious ability to decide what questions he would or would not answer, belies the argument that Michael was an easily confused, inexperienced juvenile. Further, contrary to the suggestion made by Michael's counsel when she made her oral motion in limine in the juvenile court, there was no evidence that Michael sought to speak to his mother. Michael was a year away from adulthood and was familiar with the justice system, having been in court just a week earlier. This was his third wardship petition. Under the totality of the circumstances, we uphold the juvenile court's finding that Michael's statements were voluntary and the court's denial of the motion to exclude the statements. The effect of our conclusion is that defendant's statements, as testified to by Sergeant Young at trial, were properly admitted in evidence.

B. *The Great Bodily Injury Enhancement Is Not Supported By Substantial Evidence and is Reversed.*

Michael contends that the prosecution did not prove beyond a reasonable doubt that Michael personally inflicted great bodily injury on the victim, even as a participant in a group beating.

We review this claim by looking at " 'the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof.' [Citation.]" (*In re Jorge G.* (2004) 117 Cal.App.4th 931, 941-942.)

Section 12022.7 provides in part that "(a) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony . . .

10

shall be punished by an additional and consecutive term of imprisonment . . . for three years. . . . [¶] (f) As used in this section, 'great bodily injury' means a significant or substantial physical injury."

We conclude that there is insufficient evidence to sustain the great bodily injury enhancement. The prosecution's case that Michael actually hit the victim rests on the Muni video and the testimony of Sergeant Young, who testified about statements Michael made when he was interviewed by police on August 31, 2013.

This is the testimony introduced at trial about Michael's statements:

"Q: And did [defendant Michael F.] indicate whether or not he's been on the bus?

"A: [by Sergeant Young]: He did.

"Q: What did he say?

"A: He said that he was on the bus.

"Q: Did [defendant Michael F.] say whether or not he had any sort of physical contact with the victim?

"A: He stated that he hit the victim once.

"Q: Did he actually use the term hit?

"A: I don't remember if he said hit or punch.

"Q: Did he elaborate further about how he hit or punched the victim any other details?

"A: No. . . .

"Q: Did you ever ask [Michael F.] why he hit or punched the victim?

"A: I believe he used the term as a tag along meaning everybody else was doing it, so he participated also."

On cross-examination, Sergeant Young testified that, in this same 15-20 minute interview, defendant was equivocal:

"Q: . . . [¶] Is it correct that in response to you asking why Michael was involved with this incident he said, 'I was just tagging along?'

11

"A: That was his response to why he struck the victim.

"Q: And he said I was just tagging along?

"A: Yes.

"Q: At some point did he say to you, 'I don't know if I even did hit him?'

"A: I believe something to that effect. Yes.

"Q: Right. Do you remember him saying, 'Everybody was swinging and all over the place kind of swinging wildly'?

"A: Yes.

"Q: So, he said—he said he wasn't sure whether he had hit the victim?

"A: I believe later on after he said he struck the victim, then he recanted and said, 'Well, maybe I didn't hit him.' Something to that effect. Yes."

On redirect, the prosecution did not address the testimony that Michael had "recanted." The prosecution elicited this further testimony from Sergeant Young:

"Q: . . . When you were speaking with [Michael] during this interview on August the 31st, 2013, just to be clear, in addition to indicating that he, [Michael], swung at the victim, did he also say was it clear that he sat directly next to the victim?

"A: Yes.

"Q: And so he admitted that he sat next to the victim?

"A: From what I remember. Yes."

The San Francisco Muni video was shown to the juvenile court. The victim watched it on the witness stand and, although he testified that it depicted the events that occurred on the bus that day, he did not identify his attackers from the video or in the courtroom. The San Francisco Muni video—even when played in slow motion or frame by frame—does not clearly show that Michael ever hit the victim. In closing argument, the best the prosecution could muster about the video was this:

"And if the court looks again the court will see that [defendant Michael F.] in the video once [the victim is] attacked by [co-defendant Damien W.] and some other

12

individuals [defendant Michael F.] does stand up and stands away from the other individuals but then comes back over to where all the other individuals are beating on Mr. Tatterson and he *appears to throw a punch at Mr. Tatterson.* And [defendant Michael F.] by his own admission says that he threw a punch at Mr. Tatterson." (Emphasis added.)

The prosecution's choice of the word "appears" reveals the problem with its argument. The San Francisco Muni video is simply not clear enough to show whether Michael "threw a punch" at the victim, leaving aside that there was no trial testimony that Michael ever said he "threw a punch" at the victim. Not surprisingly, in respondent's brief the Attorney General does not even attempt to characterize what the video shows as to whether Michael hit the victim, relying instead on the district attorney's closing argument that defendant "appears to throw a punch."[4]

The video shows Michael was sitting next to the victim on the bus and, immediately before the incident began, leaned across the victim and opened the window next to the victim. It shows someone from behind the victim grabbing a phone from the victim and punching him in the face. It shows others, but not Michael, join in and punch the victim as he was pushed up against a window. Michael was wearing a black puffy jacket. In the melee, he walked away from the group and then walked back towards where the victim was up against the window. In Michael's reply brief, counsel characterizes what comes next on the video: "The video shows that Michael may have swung at the victim one time, but it is not clear if he did so or if Michael actually made any contact with the victim. When Michael stepped back towards where [the victim] was pushed up against the window—and when Michael appeared to throw a punch—there were two or three people between him and the victim. When [the victim] was pushed onto the floor, Michael stepped away again, back toward the bus driver. [Co-defendant]

_____

[4] Surprisingly, however, the Attorney General contends that Sergeant Young testified "at the hearing that appellant admitted that he had personally hit [the victim] in the face." This uncited assertion is completely unsupported in the record.

13

Damian W. and the boy in the white tee shirt continued to kick [the victim], who was on the ground. Even the prosecutor, in closing argument, acknowledged that in the video Michael only 'appears to throw a punch.' "

In announcing its findings from the bench immediately after the conclusion of the evidence and closing arguments, the juvenile court did not make any factual findings with regard to the video. The court stated, "[h]aving heard the testimony of the witnesses, including the victim and the police officers, having viewed the video of the offense, and having seen all the other evidence presented by the People," it found the underlying robbery charge and the great bodily injury enhancement true. Under these circumstances, we review the same video evidence that was presented to the trial court independently. (See *People v. Vasila* (1995) 38 Cal.App.4th 865, 873.)

Having reviewed the record, including the Muni video, we cannot say that substantial evidence supports a finding that defendant personally inflicted great bodily injury beyond a reasonable doubt. Michael did not testify. No percipient witness testified that Michael hit the victim. No physical evidence linked Michael to the victim's injuries. The prosecution's case depended on the relatively few and brief snippets of testimony from Sergeant Young that Michael admitted—and then denied—he had hit the victim. Sergeant Young could not remember the precise words Michael used, and the prosecution never attempted to refresh his recollection or rehabilitate his testimony with the audiotape.[5] Even if Michael had said he "hit" or "punched" the victim, there was no

_____

[5] For whatever reason, the prosecution did not offer in evidence the actual audio recording of the officers' interview with defendant. As we have noted, Michael's counsel moved in limine to exclude all of Michael's statements on the grounds they were not voluntary, and offered in evidence the recorded interview only for purposes of the court ruling on the motion to exclude the statements. Both counsel and the juvenile court shared the understanding that the recorded interview was being offered for this limited purpose only, and consistent with that belief, the juvenile court did not mention the recorded interview as part of the basis for her findings sustaining the petition. Nor, as we have noted, was the interview transcribed for the juvenile court. Thus, in considering whether the prosecution met its burden of proof that the allegations of the petition were

14

testimony or physical evidence as to where he hit the victim or with what force. Further, Michael also denied that he hit the victim. On this record, Sergeant Young's testimony regarding Michael's statements might mean that Michael did hit or punch the victim, that he didn't hit or punch the victim, and/or that he threw a punch in the melee, but it didn't land.

Given that we find there is insufficient evidence that Michael hit the victim or the force, if any, with which he hit him, we need not reach the issue whether Michael's conduct actually caused or contributed to the victim's great bodily injury on a group beating theory. (See *People v. Modiri* (2006) 39 Cal.4th 481.)

## DISPOSITION

The order sustaining the petition is affirmed as to count 1, first degree robbery. The true finding on the enhancement that Michael personally inflicted great bodily injury is reversed with directions to dismiss that allegation. The matter is remanded to the juvenile court to issue a new disposition order.

---

true beyond a reasonable doubt, the juvenile court could not rely on the sound of the defendant's voice, or the substance and timing of the questions asked and the answers he gave in the context of the actual interview. (See CALCRIM No. 358 ["Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."]; *People v. Beagle* (1972) 6 Cal.3d 441, 455-456.)

_____

Miller, J.

We concur:

_____

Kline, P.J.

_____

Richman, J.