Filed 10/16/13  P. v. Gallegos CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046986 |
| v. | (Super. Ct. No. 09CF3141) |
| JORGE MIGUEL GALLEGOS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Carla M. Singer, Judge.  Affirmed.

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jorge Miguel Gallegos of one count of unlawful sexual intercourse or sodomy with a child under age 10 (Pen. Code, § 288.7, subd. (a); count 1),[1] three counts of oral copulation or sexual penetration of a child under age 10 (§ 288.7, subd. (b); counts 2, 3, 5), one count of dissuading a witness (§ 136.1, subd. (b); count 4), and one of lewd and lascivious acts on a child under age 14 (§ 228, subd. (a); count 6). The trial court sentenced him to a total indeterminate term of 40 years to life, plus a determinate term of 8 months.

Gallegos gave a statement after his arrest. As he did in the trial court, Gallegos claims his statements were obtained in violation of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436) and coerced. The trial court rejected his arguments and admitted evidence of Gallegos's statement at trial. We conclude the trial court's ruling is correct and affirm the judgment.

FACTS

In 2009, Norma M.[2] lived with Gallegos and her four children. Gallegos is the biological father of the youngest two children, and he assumed a parental role with Norma's eldest children, Jessica M., then eight years old, and Sheila M.

When Norma went to bed on Christmas Eve, Gallegos stayed up with Jessica and Sheila to watch a movie. Norma woke up sometime later and noticed the television had been turned off but Gallegos had not come to bed. She quietly entered the family room and saw Sheila asleep on the couch. When she peeked into the kitchen, Norma saw Gallegos and Jessica on the kitchen floor. Jessica's underpants and pants had been pulled down to her ankles. Gallegos was licking Jessica's vagina. Norma turned on

---

[1] All further statutory references are to the Penal Code.

[2] First names have been used to protect the minor's identity.

a light and told Gallegos she was going to call the police. Gallegos reacted by struggling with Norma, disconnecting the telephone line, threatening her if she called the police, and running out of the house.

Santa Ana Police Officers Richard Ribeiro and Antonio Graham were dispatched to investigate Norma's call. Norma, was "emotional," and because she spoke only Spanish, Ribeiro called for a Spanish interpreter. With the assistance of Corporal Elms, Ribeiro listened as Norma described what she had seen transpire in the kitchen. Ribeiro also found a pair of child-sized pants on the kitchen floor.

Gallegos was quickly arrested and taken to the Santa Ana Police Department. Once there, he provided a DNA sample, and the officers put him in an interview room furnished with audio and video recording equipment.

As depicted in the DVD of the interview and transcripts prepared by the prosecution and defense, Santa Ana Police Officers David Lima and Ribeiro interviewed Gallegos between 2:20 a.m. and 3:15 a.m. on December 25, 2009. Lima questioned Gallegos in Spanish. We have utilized the English translation of Lima's questions and Gallegos's answers as provided in the parties' transcripts.

Lima first introduced himself and Ribeiro and then asked Gallegos to sign a form memorializing his consent to DNA testing. Gallegos either said he needed to read the form or he could not read, and Lima explained that the form was consent for "the thing that they put in your mouth." Lima then said, "Um, before we start I . . . he . . . the officer is going to talk to you and I am going to translate. My Spanish isn't too great but you can understand me right? Yes? Yes or no?" Gallegos responded, "Yes."

After Gallegos indicated he understood Lima, the officer read the Santa Ana Police Department's standard *Miranda* admonishment of rights form in Spanish. Lima explained, "This here are your rights that you have . . . I am going to read them to you and every time that you say yes then tell me yes. Okay. 'You have the right not to say anything do you understand? [¶] . . . [¶] Yes or no? '" Gallegos responded, "Yes."

3

Lima continued, "Yes. Okay. 'What you say today . . . may be used against you in a court, do you understand?'" Gallegos replied, "Yes." Lima said, "'you have the right to an attorney before and during any questioning, do you understand?'" Gallegos again said, "Yes." Lima continued, "'If you do not have money to pay for an attorney one will be appointed for you before any questioning if you wish, do you understand?'" Gallegos replied, "Yes."

Lima asked Gallegos if he "wish[ed] to speak with us about what happened[,]" but then asked Gallegos where he was from. Gallegos said he was from Michoacán, Mexico. Lima stated, "Oh. Okay. We are going to talk about . . . about . . . we are going to talk about the . . . why we are here and all that, okay? If that's all right with you." Before Gallegos could respond, Lima asked him if he knew the date. Gallegos said the date was "24." Lima asked for the time, and Ribeiro said it was 2:20.

Ribeiro then directed Lima to ask Gallegos if he knew why he had been arrested, Gallegos responded, "[b]ecause they say that I tried to abuse the girl." He initially denied doing anything and said he did not know why Norma thought otherwise. After getting some background information about Gallegos's relationship with Norma, Lima said, "Okay. So I am going to tell you honestly that you have to . . . tell us the truth. It's in your favor for you to tell us the truth." Gallegos responded, "Well it's better for me anyway." Lima responded, "Okay. So why don't you tell us the truth?" Gallegos said, "That's the truth." Lima replied, "[t]hink about it one . . . minute." Gallegos then said, "Why am I going to lie to you, I am going to be here anyway."

Lima proceeded to ask Gallegos a series of questions beginning with whether he had kissed Jessica. Gallegos responded in the affirmative, and then admitted he kissed Jessica on the butt, "about two" times, one time being about a month before what happened on Christmas Eve. When Lima asked about what had happened that day,

4

Gallegos responded, "It was the fucking craziness I don't know what the fuck got into me . . . ."

Gallegos then admitted grabbing Jessica while they were sitting on the couch, hugging and kissing her, touching her bottom underneath her clothing, exposing his penis, and masturbating. He said he carried Jessica to the kitchen, told her to remove her pants, and then he removed her underwear. While she was lying on her back on the floor, he rubbed her vagina, and then inserted first his right thumb and then his penis into Jessica's vagina. He directed her to get down into a "crawling" position and kissed her bottom. When Lima asked, "tell me the truth, did you put your penis inside of her[,]" Gallegos responded, "Yes." Gallegos said he did not ejaculate this time, but he had ejaculated on two other occasions when he was "doing the same thing." He also volunteered that he directed Jessica "[n]ot to tell anyone."

Lima then asked a series of questions regarding the appearance of Gallegos's genitalia. Lima attempted to ask if Gallegos had been circumcised, but also asked, "how do you say circumcised in Spanish?" Gallegos responded, "That if I have . . . the skin that comes down." Lima continued, "That comes down, they did it when you were a little boy right?" Gallegos then explained that his foreskin burst during a homosexual encounter in Mexico many years earlier, and after further questioning Gallegos said he had not been operated on as a child. Lima asked Gallegos to sign a form confirming his desire to speak with the officers, which Gallegos signed, and Lima asked if the officers had threatened him "or anything like that?" Gallegos said, "No, why? [¶] . . . [¶] I'm guilty anyway."

Gallegos told Lima and Ribeiro he had consumed two beers earlier that day and admitted he once drank quite a bit of alcohol, but he denied drinking any alcohol before the other two times he molested Jessica. Lima asked a series of questions going over what had happened that night, and Gallegos admitted disconnecting the phone on his way out of the house, but denied threatening Norma if she called the police. Lima asked

if Gallegos had any questions, and Gallegos responded that he needed to go to the bathroom. After asking a few questions about Gallegos's height, weight, and eye color, and confirming Gallegos's explanation for the tear on his foreskin, Lima concluded the interview.

About the same time Gallegos was being interview, Dr. Malinda Wheeler examined Jessica at the hospital. Her physical examination revealed superficial abrasions and a fresh bleeding, tear in Jessica's hymen. Wheeler testified Jessica's injuries were of a type generally caused by penetrating, blunt force trauma to the vagina, and that such injuries would cause pain and discomfort in a pre-pubescent child. Wheeler testified that only ten percent of sexual assault victims evidence injury, and it is extremely rare to have visible, bleeding injuries during a sexual assault examination. Wheeler also testified she did not see any evidence of injury to Jessica's anus, but that the absence of any visible injury would not be unusual in cases of anal penetration.

Four days later, Dr. Sandra Murray examined Jessica. Murray looked for injuries consistent with digital and penile penetration of the vagina and anus. She also reviewed the medical report and photographs from Jessica's hospital exam.

Murray testified young girls often have a difficult time distinguishing between penetration of their vagina and anus. However, the injuries to Jessica's hymen were consistent with penetrating, blunt force to the vagina. Murray stated, "Seeing the acute injury in the same place where I'm seeing the healed injury . . . five days later, that would be highly suspicious of . . . sexual assault and certainly evidence of a penetrating injury."

Murray also testified children evaluated for sexual abuse are routinely tested for sexually transmitted diseases. In Jessica's case, the test results indicated Jessica had an active chlamydia infection. Murray described chlamydia as a bacteria that is transferred from one person to another during sexual contact or through pregnancy and childbirth. In the case of transmission through pregnancy and childbirth, Murray testified

6

the infection would resolve itself within three years. Although Norma had chlamydia in 2001, the year Jessica was born, Murray opined the infection Jessica had at the time of the sexual assault was the result of sexual contact.

DNA testing was performed on Gallegos and Jessica. Jessica's DNA could not be excluded from DNA found on Gallegos's penis and right thumb. Gallegos's DNA was found in Jessica's vulva.

*Pretrial Motion and Hearing*

Prior to trial, both parties filed motions in limine to determine the admissibility of Gallegos's statement to police. Gallegos claimed Lima violated his *Miranda* rights by failing to get an express waiver of those rights before questioning. Gallegos also asserted that his statement was involuntarily made by focusing on his moderate consumption of alcohol and illiteracy in Spanish, and Lima's limited understanding of Gallegos's particular Spanish dialect, Lima's multiple statements that it would be better for Gallegos if he told the truth, and the fact Lima obtained Gallegos's signature on the *Miranda* advisement form after Gallegos made some incriminating statements.

The prosecution claimed the record demonstrated compliance with *Miranda* because Lima explained each of Gallegos's *Miranda* rights and Gallegos said he understood each right and wished to talk to the officers. The prosecution also argued there was no evidence of coercion or promises of leniency, pointing to Gallegos ability to function as an adult who was gainfully employed, renting an apartment, and providing for his family, his general demeanor during the interview, and the fact Lima made no overt promises of leniency, as evidence Gallegos understood his rights and voluntarily waived those rights to make a statement.

The trial court conducted an evidentiary hearing and took Lima's testimony. Lima, a 15-year veteran of the Santa Ana Police Department, testified he is a

native-born Spanish speaker from Guatemala. He is certified by the Santa Ana Police Department as a Spanish/English translator at the highest grade level available in the department. While Lima acknowledged the differences in "dialect and the culture" of various Spanish-speaking populations in Mexico and Central and South America, he believed Gallegos understood him throughout the interview.

Lima said Gallegos had been handcuffed initially, but Ribeiro removed the handcuffs for the duration of the interview. He instructed Gallegos to indicate whether he understood his rights, and Gallegos responded affirmatively to each right as explained.

Lima denied making any promises or threatening Gallegos to obtain his statement. He acknowledged that Gallegos told him he had consumed two beers that night, but stated Gallegos did not appear or act intoxicated. According to Lima, the conversation was clear and Gallegos responded appropriately to each question. He also noticed that Gallegos seemed to understand some English words because he corrected the officers understanding at various points.

At the conclusion of the hearing, the trial court stated she had read the parties' point and authorities and the parties' respective transcripts of the interview. The defense had relied on *In re Shawn D.* (1993) 20 Cal.App.4th 200 (*Shawn D.*), but the court found this case inapt: "I understand the point you're making, but you are relying heavily on the officer's statement to the defendant that it would be in his favor to tell the truth. And in *Shawn D.*, the officer made it clearly an either/or. [¶] . . .[¶] This goes more than one step forward. It goes 2 miles forward."

Ultimately, the trial court held, "having looked at the transcript, both of them. And it wasn't coercive. It just wasn't coercive. And the statements that were made were voluntarily made with full knowledge of what the defendant's rights were. [¶] As far as an express waiver is concerned, well, you could have knocked me over with a feather when the Supreme Court says it's okay not to get one, but they said it years ago. So even though your allegation is that there was no express waiver because there was no

8

verbal waiver, the officer's testimony I think is credible that there was some indication by demeanor or a nod of the head that that was a waiver . . . an express waiver is not necessary for the statements to be determined to have been voluntarily made."

DISCUSSION

The trial court denied Gallegos's motion to exclude his postarrest statement, and Gallegos argues the trial court violated his rights under *Miranda* and the Fifth Amendment by admitting his confession at trial. We disagree.

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained. [Citations.]" (*People v. Smith* (2007) 40 Cal.4th 483, 502.)

According to the record, Lima explained each of Gallegos's rights under *Miranda*. Gallegos affirmatively responded that he understood each of these rights, and then he indicated a willingness to talk to the officers. Lima did not exact an express waiver of rights. However, Gallegos nodded his head in agreement when asked if he wanted to talk and then answered the officers' questions.

While an implied waiver is sufficient to satisfy the constitutional standard (*Berghuis v. Thompkins* (2010) 560 U.S.370, __ [130 S.Ct. 2250, 2259-2262]), the record must establish Gallegos understood his rights and acted in a manner consistent with a voluntary waiver. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." (*Id.* at p. ___ [130 S.Ct. at p. 2262].) In sum, when "the prosecution shows that a

9

*Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Ibid.*)

To determine if Gallegos fully understood and validly waived his *Miranda* rights, we consider factors such as the presence or absence of false promises or coercion by the police, the duration and location of the interrogation, and the defendant's age, education, and mental health. (*People v. Williams* (1997) 16 Cal.4th 635, 660-661; see also *People v. Thompson* (1990) 50 Cal.3d 134, 167.) We consider these factors in light of the totality of the circumstances. (*People v. Lewis* (2001) 26 Cal.4th 334, 383-384.)

Gallegos argues Lima coerced his statement by saying it would be better for Gallegos to tell the truth. However, a mere suggestion "that it would be better to tell the truth, when unaccompanied by either a threat or a promise, does not render a confession involuntary. [Citation.]" (*People v. Davis* (2009) 46 Cal.4th 539, 600.) Lima suggested it would be better to tell the truth, and Gallegos in essence agreed. There is no evidence of badgering, implied promises of leniency, or deception on the part of either police officer involved in the interview.

Gallegos's heavy reliance on *Shawn D., supra,* 20 Cal.App.4th 200 is misplaced. In *Shawn D.*, the officer was conducting a three-hour interrogation of a 16 year old suspected of burglary. He repeatedly told the minor, among other things, that he was putting his girlfriend in a precarious situation and the officer did not want to see her get in trouble. (*Id.* at p. 207.) The officer also said the police report would reflect whether or not the defendant was cooperative, and within the context of the defendant being tried as an adult, the officer indicated, "'*Seriously, you help us get the stuff back and I will personally talk to the* [*district attorney*] *or persons who do the juvenile.*'" (*Id.* at pp. 204-207.) The appellate court held the confession was involuntary because "[t]he promise of leniency in exchange for a confession permeated the entire interrogation." (*Id.* at p. 216.)

The differences between the present case and *Shawn D.* are patent and numerous. Lima suggested truthfulness would be best. He did not insist on a confession, promise Gallegos anything for his statements, or use some type of ruse to loosen Gallegos's tongue. This case does not involve coercion, the forceful overbearing of Gallegos's will, or false promises of some benefit attached to his confession.

As for illiteracy and the fact Gallegos was born in Mexico, we also note that Gallegos was 36 years old, employed, and supporting a family of six. Nothing in the record suggests Gallegos was unintelligent, mentally deficient, or incapable of understanding his rights. Furthermore, nothing supports Gallegos claims of intoxication. To the contrary, the DVD of the interview shows a man who appears sober and relaxed and who responds appropriately to questions.

Gallegos's reliance on *Hutto v. Ross* (1976) 429 U.S. 28 (*Hutto*) is also misplaced. As the *Hutto* court observed, the only question there was "whether a confession is *per se* inadmissible in a criminal trial because it was made subsequent to an agreed upon plea bargain that did not call for such a confession." (*Id*. at p. 30.) This case does not involve a confession made pursuant to plea bargain, and there is no evidence Lima promised Gallegos anything in exchange for his statement. (See *id.* at p. 30.)

Finally, nothing in the DVD or written transcripts supports the conclusion Gallegos misunderstood Lima. In fact, the purported confusion about circumcision actually demonstrates the opposite. Gallegos understood Lima well enough to tell him how he tore his foreskin, thus evidencing some comprehension of the word Lima had trouble translating. When the record is viewed as whole, Lima's questions engendered an appropriate response by Gallegos. In other word, there is no evidence Gallegos misunderstood Lima, or had trouble comprehending what Lima sought to convey.

As the evidence supports the trial court's determination Gallegos made an implied waiver of his *Miranda* rights, and as there is no evidence that his "'will was

11

overborne'" at the time he confessed (*People v. Cruz* (2008) 44 Cal.4th 636, 669), Gallegos's claims that his confession was involuntary and violated *Miranda* are rejected.

DISPOSITION

The judgment is affirmed.

THOMPSON, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

MOORE, J.