Filed 11/19/13  P. v. Ordaz CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>IVAN ORDAZ,<br><br>      Defendant and Appellant. | A134054<br><br>(Alameda County<br>Super. Ct. No. C159612) |

In separate gang-related incidents on the same day, defendant Ivan Ordaz shot and killed 19-year-old Tomas Melero-Smith, and with others shot at and killed 22-year-old Allan Mejia.  Ordaz admitted shooting at Mejia and Melero-Smith because he thought they were rival gang members (he was mistaken), but argued to a jury that the killings were voluntary manslaughter because he acted in unreasonable self-defense.  The jury found Ordaz guilty of second degree murder of Mejia, first degree murder of Melero-Smith, and related offenses.  Enhancements and special circumstances were found true.  He was sentenced to multiple prison terms including life without the possibility of parole.

Ordaz contends that the judgment must be reversed in whole or in part because of evidentiary and instructional errors, and prosecutorial misconduct.  He also challenges portions of his sentence.  We modify the sentence but otherwise affirm the judgment.

1

# I. BACKGROUND

A. <u>Prosecution Case</u>

    (1) <u>The Mejia Killing</u>

        (a) <u>Percipient Witness</u>

Javier Serrano testified that he was riding with Geraldo Catalan in a car being driven by Mejia around 2:20 a.m. on September 1, 2007, when they got trapped in a sideshow at 90th Avenue and Bancroft Avenue. Sideshows, as described by an Oakland police officer at trial, are gatherings of 50 to 100 cars in a matter of minutes, where drivers do stunts such as spinning doughnuts. Serrano said they were hemmed in by other cars and surrounded by members of the Border Brothers gang, who were screaming the gang's name. Mejia and Serrano were not gang members, but Catalan was a friend of someone named "Chops," who had problems with the Border Brothers. A Border Brother asked Catalan if he "still was kicking it"— associating—with Chops.

Serrano said that he, Mejia, and Catalan had no weapons, made no threats, and were not disrespectful to the group. But when Catalan ignored the question about Chops, the Border Brothers started to hit them through the open windows of the car. Mejia tried to accelerate away, but had no room to maneuver and hit a car in front of them. Serrano heard Mejia say, "Come on, brother," to someone who approached him. Then he heard more than six gunshots, covered his head, and saw that Mejia had been shot.

        (b) <u>Ordaz's Statements to Law Enforcement</u>

Ordaz was arrested on October 2, 2007, and participated in three audio-taped interviews with law enforcement officials on the night of October 2 and 3. He told police about the Mejia shooting, and about the Melero-Smith shooting. He spoke with the assistant district attorney who prosecuted the case for both shootings.

In the interviews, Ordaz admitted he was a member of the Border Brothers, a gang of approximately 500 individuals who are active in Oakland and in jails, and are enemies of the much larger Norteno and Sureno gangs. He joined the gang in 1998. Ordaz was asked "[O]ne of the things they [Border Brothers] go out and do is they do shootings,

2

right?  That's just the reality of it, right?"  He answered, "Yeah."  He told police that he had been involved in 50 to 60 gang-related shooting incidents.

He came to Oakland from Stockton the day before the shootings and got a revolver.  He was drinking alcohol, using cocaine, and high on ecstasy pills.  He said that when he uses cocaine, "stuff goes through my head[,] just evil thoughts . . . ."  Cocaine makes him feel "invincible," "like . . . I'm the king of the world . . . and nobody can stop me . . . ."  Ecstasy "messes up . . . your thinking . . . . [E]ven though if you see somethin' and somebody tell you to stop, you won't stop cause that's what your mind is set to . . . . [S]ometimes you can't communicate right . . . . [Y]ou get a really crazy look . . . ."

He rode to the sideshow in a car with other Border Brothers, got out, and confronted passengers in one or two other cars who he thought were Nortenos.  Then he saw a group of Border Brothers surrounding another car, hitting the windows, kicking the doors, punching the driver, and trying to pull him from the car.  He pulled out his gun and ran to the driver's side of the car.  He thought the driver had to be a Norteno or Sureno, and that people in the car must have been threatening his friends because his friends were hitting them.  He shot twice, aiming at the bottom of the driver's side window.  He then heard shots fired from three other guns.

When he was asked by the police why he shot when the other Border Brothers were only punching and kicking, he answered, "I don't know probably . . . instinct told me he had . . . a gun or something . . . ."  When he was asked by the police what the driver was doing when he shot at the car, Ordaz answered, "[H]e was trying to grab the steering wheel and at the same time go under the seat or . . . was he trying to cover, I don't know . . . ."  Ordaz told the district attorney that he thought the driver was trying to reach under his seat to grab a knife or a gun.

(c)  Physical Evidence

An autopsy showed that Mejia died of approximately 15 gunshot wounds, none of which could be considered the sole cause of death.  Evidence technicians recovered 16 bullet casings at the scene, and a bullet from the driver's side floorboard of the car.  The

car's back window had been shot out, and there were bullet holes in the driver's door and window.

  (2) <u>The Melero-Smith Killing</u>

   (a) <u>Percipient Witnesses</u>

Anthony Sabral and Martin Moreno testified that Melero-Smith was with them outside Sabral's apartment around 7:00 p.m. on September 1. A white car, with what Moreno called "sketchy people," drove by, returned, and stopped. A man with a black and white bandana around his neck got out of the car and walked quickly across the street toward them. The man, in Moreno's words, looked "menacing" and "very hood." When he got up close to them, he pulled out a gun, and asked, "Y'all banging?" or "Y'all bang, cuz?" Melero-Smith, Sabral, and Moreno ran away, saying "no, no, no, no." They were not involved with gangs and were unarmed.

The man started shooting. Sabral escaped to his apartment and Moreno escaped to a laundry room. As they were running away, Moreno saw Melero-Smith fall. From the laundry room, Moreno could see Melero-Smith lying face down in the driveway with his hands by his sides. Moreno approached Melero-Smith, discovered that he had been shot in the head, and called the police.

Carmen Gomez testified at the preliminary hearing and that testimony was read to the jury because she was unavailable as a witness at trial. Gomez, Ordaz (nicknamed Silent), Jose Lopez (Lupio), and Hector Arvizo (Dumb Dumb) were riding in a car driven by Jose Castillon (Bear) in the early evening of September 1, 2007. They were going to her apartment to get a bottle of Hennessey cognac to bring back to a barbeque they were attending at the home of the mother of Alejandro Chaidez (Wino). On the way to her apartment, they saw guys standing on the sidewalk by a car, one of whom was wearing a red and white cap. Ordaz, who was drunk and "not in his correct mind," made a derogatory comment inside the car about Nortenos.

Gomez said that about ten minutes later, when they were returning to the barbeque, Ordaz told Castillon to make a turn and drive back to the guys to see "where they were from," "gang-wise or turf-wise." Ordaz told Castillon to stop the car across the

4

street from them. Ordaz took a gun out of his pocket, got out of the car, and walked toward them talking loudly. The guys backed up, "shaking their heads basically saying no." When they saw the gun, they turned and ran up a driveway toward some apartments. Ordaz stood on the sidewalk, fired about three shots at them, and then took off running. Castillon made a U-turn and drove away from the scene. When they were driving away, Gomez saw someone on the ground.

Arvizo, testifying under a grant of immunity, said that he was riding in the car with Ordaz, heard gunshots, but did not know "who really shot." When he was interviewed by police about the incident, he said that he saw Ordaz approach Melero-Smith with a revolver and heard him fire two or three shots. At the preliminary hearing, he testified that he told the truth in his police interview.

(b) Ordaz's Statements

Ordaz said that he continued drinking alcohol and using cocaine after the Mejia shooting. He, Bear, Lupio, and Dumb Dumb left Wino's mother's house in a car to pick up Gomez. Along the way three or four guys "mean mugg[ed]" them—gave them a "hard stare"—as they drove by. He thought they were Nortenos because one of them was wearing a red hat with white letters, and someone in the car said he had seen them hanging around Nortenos. The hat stood out because red was rarely worn in the area. He thought the guys did not belong there because he had never seen them before. He told the people in the car that, after picking up Gomez, "we're gonna stop and check these fools real quick" because Border Brothers are expected to confront Nortenos.

After they picked up Gomez, he told the driver to pull over and stop by the guys he believed were Nortenos. He spoke with the district attorney about what he would do if they were in fact Nortenos: "Q. . . . What were you thinking about—hey, if these are Nortenos and they're here, what was your thinking as far as what you were gonna do about that? [¶] A. Gotta get 'em out of here. [¶] Q. How do you do that? [¶] A. I mean, whatever, whatever's possible. [¶] Q. And what were you thinking about as far as those possibilities? [¶] A. Mmm, shoot 'em."

5

He got out of the car and walked up to Melero-Smith and his friends. They ran away as he approached. He had his revolver in his pants pocket and they did not see it before running. As they ran, one of them said "hood," or "Norte." He fired three or four shots, aiming "kind of in their direction." He fired the first shot "to tell them to freeze." One of them was running into the house, possibly to get weapons or friends. He fired more shots so they would not "feel compelled to come outside." He had consumed a lot of cocaine and alcohol, and was not thinking straight.

        (c) <u>Physical Evidence</u>

Police found a "deformed" bullet and two sets of possible bullet fragments at the scene. An autopsy showed that Melero-Smith died of a gunshot wound to the head, and the fatal bullet was recovered from his skull. An expert in firearms identification determined that the bullet in Melero-Smith's skull and the bullet on the driver's floorboard in the car where Mejia was shot were fired from the same gun.

        (3) <u>Expert Testimony About the Border Brothers</u>

An Oakland police officer testifying as an expert on Latino street gangs testified that the Border Brothers are comprised of smaller groups who banded together initially to traffic in crack cocaine. Border Brothers, whose colors are black and brown, are enemies of Nortenos, whose color is red, and Surenos, whose color is blue. Border Brothers claim territory in Oakland that includes the sites of the murders in this case. When the murders occurred, Border Brothers had at least 250 members, including Ordaz, Castillon, Lopez, and Chaidez. Members gain respect within the gang through violent acts, usually committed when they are together with other members.

The officer detailed his reasons for believing that Ordaz, Castillon, Lopez, and Chaidez were gang members. One basis for the officer's opinion that Ordaz was a member was his 2006 conviction of felony assault. In that incident, Ordaz, Chaidez, and another Border Brother were trying to break into a vehicle when they were confronted by the owner. They assaulted the owner, who was hit and kicked and suffered a "cut to the head." The officer testified to three incidents in 2002, and an incident in 1998, when Ordaz was associating with Border Brothers who were on probation or suspected of

6

committing crimes. In a 1999 incident when police were dispatched to investigate vandalism, Ordaz was arrested for possession of a knife on school grounds.

The officer testified to other crimes committed by Border Brothers, including: a 2006 killing, when Border Brother Vicente Gomez was killed by his fellow gang member Jose Rodriquez, who was convicted of voluntary manslaughter; a 2006 killing by gang member Alphonse Aquior Figueroa, Junior, who was convicted of murder with a gang enhancement; and possession of a controlled substance for sale by Castillon in 2006.

B. Defense Case

(1) Sisters' Testimony

Ordaz's older sister, Ana Ordaz (Ana), and younger sister, Marisol Medeiros (Medeiros), testified about his life and misfortunes. Ordaz was born in 1981 and grew up in a home plagued by domestic violence, drugs, and alcohol. Ana dropped Ordaz a few times while taking care of him when he was around two years old, causing him to suffer a seizure on one occasion, which she did not disclose to avoid being punished. At around age five, Ordaz twice fell out of trees onto his head and had to be taken to the emergency room.

Ana said that Ordaz was close with his younger sister Ava, and that he followed her into a gang to protect her. By 2000 he was heavily involved with gangs, and he was shot in October of that year. Due to his injuries, he underwent a bowel resection and had to wear a colostomy bag for about a year. He relapsed into drug use a few months after the shooting. Ana recalled going to his apartment during this period and finding him acting very paranoid. He did not recognize her and asked if a badge she wore for work was a camera. He later told her that he had been mixing cocaine with marijuana.

Ana and Medeiros testified that Ordaz moved in with a girlfriend, Laura Hanson, in Stockton, when Hanson was pregnant with twins. Ordaz was very much looking forward to being a father. Hanson was due to give birth in late January or early February of 2006, but after disappearing for a few days said that the babies had been delivered stillborn. Ordaz was devastated, started returning to Oakland, and resumed using drugs. Ana said, "He was very violent, just being irrational."

7

Ordaz was further devastated when Vicente Gomez, his best friend, was murdered in June 2006. Ana said that his drug use worsened, and he was again acting very paranoid. He told Ana that he was not sleeping, and that he was hearing voices and having hallucinations.

Medeiros said that after Ordaz got out of jail in March 2007 following his assault conviction, he "wasn't himself anymore" and "seemed a little paranoid." When he was living with her in July 2007, he told her that he was getting drunk and using drugs with friends, but he was not constantly on drugs or paranoid, so she trusted him to take care of her one-year-old daughter.

(2) Expert Testimony

Forensic psychologist Carol Walser testified for Ordaz as an expert in neuropsychology, psychological testing, and diagnosis of mental disorders. In November and December 2010, she conducted a six-hour clinical interview of Ordaz and administered 13 hours of psychological tests. Ordaz reported being physically abused by his father, and sexually abused from age 13 to 17 by a man who plied him with drugs. He took reckless chances because he did not find life worth living, and was suicidal after the death of his best friend.

Ordaz detailed the drugs and alcohol he consumed around time of the killings. He said that, because of his intoxication, he was paranoid, his mind was "polluted" and "gone," and he "couldn't think at all" or "discern anything like right or wrong."

The tests Walser gave Ordaz included three that showed he was not malingering. The testing revealed a very high level of paranoia, which "indicates that he is likely to misread and misinterpret social situations and the intentions of others due to this paranoia." The testing also revealed severe post traumatic stress disorder (PTSD). Walser made the following diagnoses pursuant to the DSM-IV criteria:

Axis I (clinical syndromes) included polysubstance-induced psychotic disorder (PIPD), "which means the person is out of touch with reality." Alcohol, cocaine, marijuana, and ecstasy can each produce hallucinations and delusions. Cocaine-related delusions are "typically persecutory delusions, that means paranoid delusions, the person

8

believes that somebody is going to harm them." Delusions associated with marijuana are also "usually paranoid or persecutory." The PIPD diagnosis was based on Ordaz's statements to the police and the district attorney, his reports of delusions such as thinking "that his sister's pendant was a camera," and his sister's report of "finding him in this psychotic state when he's been under the influence." The PIPD diagnosis was also based on tests showing that he had a substance abuse problem, and "that at times that this could be a psychotic disorder."

Other of Ordaz's Axis I diagnoses included: chronic PTSD, which Walser attributed to the sex abuse, and family and gang violence he had suffered; generalized anxiety disorder; and dysthymic disorder (long-term, low-level depression).

Walser's other diagnoses were: Axis II (personality disorders)—none, but "depressive personality traits, paranoid personality traits and negativistic personality features [a pessimistic outlook on life]"; Axis III (medical conditions)—gunshot wound; Axis IV (psychosocial factors)—the charged crimes; and Axis V (general level of functioning)—"serious symptoms."

Walser opined, based on "the information . . . that I obtained through my interview of him and the other interviews," that Ordaz's PIPD was active on the day of the killings. She said that having a false sense of danger would probably constitute a paranoid delusion, and that people under such a delusion commonly instigate attacks to defend themselves. She said that a person "switching from being in reality to being out of reality or out of touch with reality, it can happen like that. . . . [I]t's a moment-to-moment thing." She had the following exchange with the prosecutor on cross-examination: "Q. Folks that get high, they can do stupid things, right? [¶] A. Right. [¶] Q. They can make bad decisions, right? [¶] A. If they're in reality it can be a bad decision. If they're in psychosis it's not a decision."

C. Verdicts

The jury found Ordaz guilty of: second degree murder of Mejia; shooting into an occupied vehicle (Pen. Code, § 246); and first degree murder of Melero-Smith. As to each of these counts, the jury found true enhancements for discharge of a firearm causing

9

death (Pen. Code, § 12022.53, subd. (d)), and commission of the crime to benefit a criminal street gang (Pen. Code, § 186.22, subd. (b)). The jury returned special circumstances findings of multiple murders (Pen. Code, § 190.2, subd. (a)(3)), and commission of Melero-Smith's murder for the benefit of a criminal street gang (Pen. Code, § 190.2, subd. (a)(22)). The jury also convicted Ordaz of two counts of possession of a firearm by an ex-felon. (Pen. Code, § 12021, subd. (a).)

## II. DISCUSSION

A. Evidentiary Issues

(1) Admission of Ordaz's Statements to the District Attorney

Prior to trial, Ordaz moved to exclude his statements in the two police interviews and the interview with the district attorney on the ground that they were obtained in violation of the *Miranda* rule (*Miranda v. Arizona* (1966) 384 U.S. 436). Ordaz argued that he was kept in the interview room for approximately 14 hours without being permitted to go to the bathroom, and thus his statements were involuntary. The motion to suppress was denied.

On appeal, Ordaz renews only his challenge to admission of his statements to the district attorney on the ground they were involuntary. He argues that, by the time that interview was conducted, he was "exhausted" and had gone many hours without a bathroom break. He contends that, even if his police interviews were properly admitted, he was prejudiced by admission of his district attorney interview because, in closing argument, "the prosecutor made heavy impeachment hay of [his] final statement, claiming [he] added new details supporting self-defense in both instances, showing he was lying that he shot in honest fear." There was no error, so we need not reach the issue of prejudice.

Admission of an involuntary confession into evidence violates a defendant's state and federal rights to due process. (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 208.) A confession is involuntary when, in light of the totality of the circumstances, the defendant's choice to confess "was not 'essentially free' because his will was overborne." (*People v. Memro* (1995) 11 Cal.4th 786, 827.) To be considered voluntary, a confession

10

or admission must be shown to be so by a preponderance of the evidence. (*People v. Markham* (1989) 49 Cal.3d 63, 71.) The issue is determined on the record of the questioning as a whole, taking into account the character of the accused and the details of the interrogation. (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.) Whether a confession was voluntary is subject to our independent review, but we must accept a trial court's factual findings if they are supported by substantial evidence. (*People v. Richardson* (2008) 43 Cal.4th 959, 992-993.)

The following evidence was adduced at the hearing on the motion to suppress:

Ordaz was arrested in Stockton on October 2, 2007, and put in an interview room at the Oakland Police Department at 5:45 p.m. Oakland Police Sergeant Tony Jones testified that he checked on Ordaz every hour when Ordaz was not being interviewed by opening the door to the room and looking in, "to see if [he] need[ed] anything, to use the restroom or need[ed] water or anything like that." When Jones checked on Ordaz and saw his head down on the table, he assumed Ordaz was sleeping. Jones's kept a "room log," which recorded his observations of Ordaz, when Ordaz was fed, and times when he was interviewed.

Ordaz was apparently sleeping at 6:50 p.m., 7:40 p.m., and 8:30 p.m. He was questioned from 9:53 p.m. to 11:30 p.m. about Melero-Smith's killing, and from 11:42 p.m. to 1:17 a.m. about the Mejia killing. He was told at the end of the second interview that he would be having a third interview with a district attorney. At 2:20 a.m., he was given a cheeseburger, fries, and a Coke. He was apparently sleeping at 3:10 a.m., 4:00 a.m., and 5:00 a.m., while the district attorney reviewed his prior statements. He was interviewed by the district attorney from 5:22 a.m. to 7:25 a.m.

Nothing in this record suggests that Ordaz's statements to the district attorney were involuntary. He was apparently able to sleep before and after his questioning by the police, belying his claim of exhaustion. He was fed. He was checked hourly to see whether he needed anything. Sergeant Jones entered the room, and did not just look through a window, when he observed Ordaz. Thus, Ordaz would have known that he was being monitored, and had ample opportunities to request to use the bathroom. There is

11

no evidence that the police were guilty of any coercion or neglect, or that Ordaz suffered from any fatigue or distress during his interview with the district attorney.  We independently agree with the trial court that Ordaz's statements were shown to be voluntary.

(2)  Admission of Details of Ordaz's Assault Prior

Ordaz filed an in limine motion to exclude or limit the testimony of the prosecution's gang expert, and argued that the expert should be precluded from "making conclusionary statements regarding [Ordaz's] specific intent during commission of the acts" charged.  Ordaz also objected to the gang testimony under Evidence Code section 352, arguing that its prejudicial effect would outweigh its probative value.  According to Ordaz, the evidence would have little probative value because he was not disputing his gang affiliation, and it would be highly prejudicial because it would be inflammatory and "bring in hearsay that has no assurance of reliability."

The court sustained the objections insofar as they sought to prevent the expert from testifying to Ordaz's specific intent.  The court ruled that the expert "shall not testify about anybody's states of mind, what they were actually thinking."  The court sustained some of the Evidence Code section 352 objections to gang-related incidents the expert had investigated, but overruled those objections to predicate offenses that were offered to show a pattern of criminal gang activity, including Ordaz's 2006 conviction for assault.

The prosecution was permitted to introduce evidence of the 2006 assault in part because Walser, the defense psychologist, was going to raise it.  When use of the assault as a predicate offense was first argued, the court noted that, according to Walser's report, Ordaz told her that he was arrested for the assault because he was "defending someone that afterwards did not want to testify on his behalf."  The court said, "So it's coming into evidence that way," and defense counsel replied, "It would appear so."  The court later observed that the assault was "certainly a basis for the opinions" in Walser's report, and confirmed with defense counsel that "this information is going to come to the jury in that respect."   Thus, one reason for admitting the prior was "the offer of proof the defense

12

has made about what Dr. Walser may testify to . . . . [¶] . . . I am somewhat loath to exclude such evidence for the prosecution while knowing that the defense is going to be permitted to put it in."

The assault was also relevant, or potentially relevant, because it demonstrated Ordaz was a felon for purposes of the possession of a firearm charges, and served as a ground for impeachment in the event Ordaz testified. Moreover, "sanitization" of the prior crime was discussed in both of those contexts. When impeachment was discussed, the court identified "three possibilities": (1) "without any sanitizing having occurred, he committed . . . an assault . . . with a deadly weapon"; (2) "partial sanitizing, convicted of a crime involving violence"; and (3) "full sanitizing, would be convicted of a felony." When defense counsel expressed a preference for the full sanitizing option, the court asked, "Is it likely that your expert is going to testify about this 245 in some detail?" and counsel responded, "I'm making the record here in case something happens during the course of the trial that is unanticipated." After deciding that the assault could be used for impeachment and as evidence on the gang issues, the court told the prosecutor that he could "prove [the assault] up directly without any sanitizing or bifurcation . . . as an element of the [firearm possession] charge[s]."

Defense counsel did not object when the court ruled that the assault could be introduced "unsanitized" in the prosecution's case-in-chief, and did not object when the prosecutor elicited testimony from the gang expert that Ordaz and two other Border Brothers were trying to break into a victim's car, hit and kicked the victim, and cut the victim on the head. Thus, while counsel objected to admission of the assault, he did not object to admission of the *details* of the assault, and thereby forfeited the argument Ordaz seeks to raise in this appeal. (Evid. Code, § 353, subd. (a) [timely, specific objection is required].)

Ordaz contends that, if the argument was forfeited, then his trial counsel was ineffective for failing to preserve it. "On direct appeal, a conviction will be reversed for ineffective assistance [of counsel] only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked

13

for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  None of these conditions are satisfied here.  The record indicates that counsel may have refrained from objecting to the details of the assault because he intended to explore them with the defense psychologist.

In any event, Ordaz's Evidence Code section 352 argument against admission of the assault lacks merit.  Evidence is excludable under section 352 only if its probative value is substantially outweighed by its potentially prejudicial effect.  The details of the assault were relevant to prove that it was gang-related, and evidence that Ordaz participated in punching, kicking, and cutting someone was not inflammatory in the context of the shootings charged in the case.  As the court explained, the prejudicial effect of the assault and other evidence of Ordaz's gang association was "near zero" in context.  "[A]ll of this information I've looked at related to Mr. Ordaz is far, far, far less inflammatory than the direct evidence about the two murders that he's accused of [committing].  [¶] So if the murder of Mr. Mejia with those many, many bullet holes in his body, if we called that a ten on the inflammatory scale, nothing in the rest of this information rises above about a three, to give some relative context here. . . . So I find that nothing else I'm looking at comes within a country mile in terms of inflammatory effect as the direct evidence of these two murders."  No abuse of the court's broad discretion under Evidence Code section 352 (e.g., *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124) can be shown in admitting the circumstances of the assault.

(3)  Restriction of Defense Expert Testimony

Walser testified that Ordaz made about ten statements in his interview with the district attorney that were consistent with his claims of drug use at the time of the killings.  When she was asked to identify those statements in the transcript of the interview, the court asked counsel for sidebar conference, and then "sustain[ed] [its] own objection [to the question]."  Ordaz contends that the court erred in so doing because Walser's opinions were based to a significant extent on his interviews with law enforcement, and she should have been permitted to explain why the interviews supported her conclusions.

14

The judge said that he excluded the evidence because "I developed concern based on the testimony that I was hearing that the witness was getting ready to tell the jury that she believed and they should believe what Mr. Ordaz told her. So she was getting ready to give an opinion on whether what he said to her during the 19 hours of interviews was credible and truthful. [¶] And she had not yet approached this point yet and I called counsel to [sidebar] and this was a point where . . . it seemed to me [defense counsel was] eliciting an analysis by the expert on the things that Mr. Ordaz had told her about his drug use and [he was] asking her to compare that to all the specific places in the statement to [the district attorney] and the statement to the police where he had also said similar things. [¶] And she was beginning to go through and do that analysis and I interrupted that and . . . indicated to both counsel that among other things I would not allow a police officer to offer the opinion as to whether Mr. Ordaz in an interview was telling the truth or was not telling the truth, I would not allow a police officer or any other witness to speak to whether any witness testifying in the trial was telling the truth or not. That's an issue that the jury gets to decide."

When the issue was discussed, the prosecutor argued that "the [interview] transcript will speak for itself, and during argument [defense counsel] can point out whether or not the two [Ordaz's statements to the district attorney and Walser] coincide . . . ." Defense counsel argued that comparing Ordaz's statements to Walser and those he made to the district attorney did not constitute improper vouching for Ordaz's credibility. The court responded to defense counsel: "But as our record shows my concern was prophetic. Because at least twice, if not three times, she went into giving opinions about whether Mr. Ordaz had told her the truth. And I admonished her twice in front of the jury not to do that."[1]

---

[1] After the ruling at issue, Walser testified that during her interviews with Ordaz, he "was alert and open and he seemed honest and sincere when he gave the accounts of his life." The court interrupted, saying, "Okay. That last statement, that's going to be stricken from the record. You are not to consider that statement. The decision about any witness's credibility . . . is for the jury to decide. [¶] So I won't allow any expert witnesses to come in and tell you which witnesses are telling the truth and which one's

15

"The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.) Whether or not a comparison of what Ordaz told Walser and the district attorney about his drug use around the time of the killings would have been improper "vouching," the purpose of such a comparison would have been to bolster Ordaz's credibility on the subject.

In any event, the court did not, as Ordaz suggests, weaken Walser's opinions with a broad ruling that she could not base them on his interviews with law enforcement. It merely precluded her from going through ten points in his interview with the district attorney when Ordaz said the same things he told her about his drug use. The ruling was a narrow one and Ordaz was not prejudiced by it. The jury heard what Ordaz told the district attorney and Walser about the drugs he consumed, and did not need expert assistance to determine the extent to which those statements were consistent. Moreover, while the court did not permit Walser to opine that Ordaz told her the truth, it allowed her to opine that her testing showed that he was not malingering. The court did nothing to undermine Walser's or Ordaz's credibility.

B. Prosecutorial Misconduct

The defense argued to the jury that Ordaz was guilty of no more than voluntary manslaughter because he acted in unreasonable self-defense when he shot at Mejia and Melero-Smith. In final closing argument, the prosecutor said the defense was trying to

---

aren't, that's your job. [¶] So, Dr. Walser, I'm going to instruct you no more opinions about whether people are telling the truth or not. I know you know that, no more."

Despite that admonition, Walser proceeded to testify that Ordaz was asked in psychological testing, "have you ever felt such and such? And so he would answer yes because he has at some time." The court again interrupted and struck this testimony, admonishing the jury not to "allow the expert witness to substitute her judgment of his truthfulness in the interviews for your judgment of the same subject matter. You are the independent judges of all facts in dispute. No witness is permitted to substitute their judgment for yours."

"fool" the jury with that argument. Ordaz contends that the remarks were misconduct because the argument was an improper attempt to "denigrate defense counsel or accuse him . . . of trickery or fabricating evidence." Ordaz maintains that the prosecutor committed further misconduct and misstated the law by telling the jury that the court was required to instruct on voluntary manslaughter even if the instructions lacked evidentiary support. (See *People v. Barton* (1995) 12 Cal.4th 186, 194-195 & fn. 4 [instructions on voluntary manslaughter as a lesser included offense of murder require evidence "substantial enough to merit consideration by the jury"].)

The context for the challenged remarks concerning voluntary manslaughter was as follows:

"You are going to receive an instruction with all other instructions very shortly, and there's an instruction in here that basically says, look, whether—you are going to hear lots of instructions. Whether certain jury instructions even apply to this case is going to depend on what you really find to be the facts. Disregard any instruction which applies to facts determined by you not to exist.

"So the Court's responsibility, the judge, is to provide the law to you accurately and completely. The mere giving of an instruction to you doesn't mean that there quite frankly is anything behind the theory that the instruction deals with. For example, you are going to [receive] instructions in here about involuntary manslaughter. You may have noticed that [defense counsel] didn't talk that much at all about involuntary manslaughter. I haven't either. Why? Well, as you look at the instruction for involuntary manslaughter you are going to see that it's a killing without intent to kill, without conscious disregard. And basically it's premised on the idea that somebody might negligently discharge a firearm and cause death. [¶] . . .

"We are not even close to the world of involuntary manslaughter here. Yet you will see instructions about involuntary manslaughter because it's the Court's duty to instruct you fully on the law of homicide. Similarly, the Court will instruct you on this theory of voluntary manslaughter based upon the actual but unreasonable belief in

17

self[-]defense.  *The fact that instruction is given to you doesn't mean that there's anything whatsoever in the evidence that supports that kind of verdict*.

"The claim that Allan Mejia was reaching for a gun, the claim that I believe that these guys were going to run into the house and get guns, first of all is contrived.  And especially in the murder of Tomas Melero-Smith, to say that you can stand out in front of a building and people run away that, oh, I believed they were going to go in and get guns and come back out and kill me, so therefore I had to shoot them as they were running away is absurd.

"If that's actually your belief and honestly your belief what are your actions going to be?  Run away yourself.  You've got time, they're going to go into the house.  Go back [to] the car. . . . To say that that is what was motivating him shooting at those boys is ridiculous.

"The killings in this case are not manslaughter by any stretch of the imagination.  The defense finds the little excuses that the defendant provides in his interviews, they go and find Dr. Walser who is very happy to have a very narrow view of the defendant and accept what he says to her as the truth and to go from there.

"And they take all of that, and they literally threw it up on the wall and they want to try to make something stick to try to confuse you.  Quite frankly, to see if *they can find one of you to be fooled* by that.  *That's all they need, for one of you to be fooled* by all this that's thrown on the wall that somehow turns this into something other than what it is, which is a straight-up, cold-blooded murder.

"How do you know it's thrown up on the wall?  Think about the defense argument in this case.  They come in here and say look at all these bad things that happened to Ivan Ordaz.  Look at the drugs he was taking.  What did they ask you to do with it?  What did they say how this fits within the law?  They just said he's drunk, he's high, he's got all these mental problems, he's had these problems in his life.  Did they give you any guidance about what you are supposed to do with that other than throw it up on the wall and hope that you will be fooled by it? [¶] . . .

" . . . The issues that were raised by the defense in *an attempt to somehow fool you* that this is no more than voluntary manslaughter is not worthy of much, quite frankly. [¶] . . .

"Standing at the side of the car where you know somebody is sitting in the driver's seat and firing a gun through the driver's side multiple times or revolver rounds in the head of Mr. Mejia, at a minimum—at a minimum, ladies and gentlemen, that is second degree murder. That's about the definition of implied malice.

"Coming up to three guys on the sidewalk and as they're running away up this driveway taking a gun pointing it at their direction and firing multiple times, knowing that they're human beings, knowing that they're running away, at a minimum conscious disregard, dangerous act, implied malice." (Italics added.)

Ordaz's challenges to the italicized remarks are unavailing. He forfeited his challenges by failing to object to the remarks and ask that the jury be admonished to disregard them. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1001; *People v. Bell* (1989) 49 Cal.3d 502, 538-539.) Moreover, the prosecutor did not commit misconduct.

The repeated warnings against being "fooled" by the imperfect self-defense theory "[r]ead in the context of [the] broader argument . . . were a fair response to defense argument . . . and reflected the prosecutor's belief in the inadequacy of the evidence relied on by the defense." (*People v. Frye* (1998) 18 Cal.4th 894, 978, [no misconduct where the prosecutor called the defense "irresponsible," "ludicrous," and a "smoke screen"], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "The prosecutor's remarks . . . would be understood by the jury as an admonition not to be misled by the defense interpretation of the evidence, rather than as a personal attack on defense counsel." (*People v. Cunningham*, *supra*, 25 Cal.4th at pp. 1002-1003 [no misconduct where the prosecutor said it was defense counsels' job "to create straw men" and "put up smoke, red herrings"]; see also *People v. Medina* (1995) 11 Cal.4th 694, 759 [statement that " 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something' " did "not amount to a personal attack on counsel's integrity"]; *People v. Bell*, *supra*, 49 Cal.3d at p. 538

19

[statement that defense counsel " 'wants to confuse you' " "could be understood as a reminder to the jury that it should not be distracted from the relevant evidence and inferences that might properly and logically be drawn therefrom"].)

Nor did the prosecutor misstate the law in saying "[t]he fact that instruction is given to you doesn't mean that there's anything whatsoever in the evidence that supports that kind of verdict."   Although a lesser included offense instruction should be given only when the evidence supporting it "is substantial enough to merit consideration by the jury" (*People v. Barton*, *supra*, 12 Cal.4th at p. 195, fn. 4), the jury is free to find, in the prosecutor's words, that there is "[no]thing whatsoever in the evidence that supports that kind of verdict."  As the jury was told in the CALJIC No. 17.31 instruction to which the prosecutor properly referred:  "Whether some instructions apply will depend upon what you find to be the facts.  Disregard any instruction which applies to facts determined by you not to exist."  The prosecutor did not erroneously say "[t]he fact that instruction is given to you doesn't mean that there's anything whatsoever in the evidence that [*could support*] that kind of verdict."  The prosecutor's statement was, in context, primarily a comment about the defense evidence rather than a statement about the applicable law.

C.  Instructional Issues

(1)  Mental Disease

Ordaz contends that the court erred in refusing two pinpoint instructions he requested, and in giving a truncated version of CALJIC No. 3.32, relating his mental condition to the states of mind required for conviction.

CALJIC No. 3.32 states:  "You have received evidence regarding a [mental disease] [mental defect] [or] [mental disorder] of the defendant _____ at the time of the commission of the crime charged [namely, _____] [in Count[s] _____ [.] [or a lesser crime thereto, namely _____].  You should consider this evidence solely for the purpose of determining whether the defendant _____ actually formed [the required specific intent,] [premeditated, deliberated] [or] [harbored malice aforethought] which is an element of the crime charged [in Count[s] _____], namely, _____ [.] [or the lesser crime[s] of _____]."

20

The court instructed with a modified CALJIC No. 3.32 that read: "You've received evidence regarding a mental disease, mental defect, or mental disorder of the defendant at the time of the commission of the crimes charged. You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required state of mind, which is defined elsewhere in these instructions."

Ordaz did not object to this modified version before the case was submitted to the jury, but argued in a motion for new trial that the instruction should have specified particular charges and the mental states required for each. The court said that it modified CALJIC No. 3.32 to broaden it so Ordaz could argue that his mental condition prevented him from having the mental state required for general intent, as well as specific intent, crimes.

There was no error. Ordaz's argument that the court's modified version of CALJIC No. 3.32 was deficient because it did not specify the mental states involved in the various charges against him is untenable under *People v. Rundle* (2008) 43 Cal.4th 76 (disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22). There, as here, the court gave a shortened and more general version of the instruction that stated simply: " 'Evidence has been received from which you may find that the defendant was affected by a mental condition at the time of the crimes charged. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed any intent or mental state which is an element of the crimes charged.' " (*People v. Rundle, supra*, 43 Cal.4th at p. 148.) The defendant argued that the trial court "erred by failing to specifically name for the jury the intent or mental state to which defendant's 'mental condition' evidence was relevant." (*Ibid.*)

The argument failed: "We previously have rejected challenges similar to defendant's regarding the failure explicitly to define the term 'mental states' in instructions concerning the effect of a mental defect upon the defendant's ability to form mental states required for the commission of various offenses. Thus, we have found no error in cases in which a mental defect instruction merely mention the term 'mental state' in a generic sense, but the trial court elsewhere . . . generally instructed that ' " '[t]he

21

mental state required is included in the definition of the crime charged.' " ' " (*People v. Rundle*, *supra*, 43 Cal.4th at p. 149.) This reasoning applies equally here. The court instructed the jury that crimes involve "both an act and a state of mind," and its version of CALJIC No. 3.32 advised that "the required state of mind" was "defined elsewhere in these instructions."

The requested pinpoint instructions stated: (1) "You have heard evidence that the defendant may have suffered from a mental disease or defect [at] the time of the commission of the charged crimes. You may consider this evidence in determining whether the defendant possessed the mental states required for the charged crimes"; and (2) "If you have a reasonable doubt as to whether the defendant possessed the required mental state or states, you must find that he did not possess the required mental state or states."

When the instructions were discussed during trial, the court explained that it declined to give the requested pinpoint instructions because their subject matter was covered by other instructions. The first of the requested pinpoint instructions was covered by the modified version of CALJIC No. 3.32 the court furnished. The second pinpoint was also covered by other instructions, including the general instruction on reasonable doubt (CALJIC No. 2.90), the instructions identifying the mental states associated with the charges, and the last paragraph of CALJIC No. 4.21.1, the instruction on voluntary intoxication that was read to the jury immediately after CALJIC No. 3.32. That paragraph states: "If from all the evidence you have a reasonable doubt whether a defendant had the required specific intent or mental state, you must find that defendant did not have that specific intent or mental state." The jury did not need to hear this instruction twice when it was being instructed on the relevance of Ordaz's mental condition and voluntary intoxication.

(2) <u>Limiting Instruction on Gang Evidence</u>

Following closing arguments, the court instructed the jury pursuant to CALCRIM No. 1403:

"You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related *crimes* and enhancements and special circumstances allegations charged, or the defendant had a motive to commit the crimes or the defendant actually believed in the need to defend himself or the defendant acted in the heat of passion.

"You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied upon by an expert witness in reaching his or her opinion. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant was a person of bad character or that he has a disposition to commit crime." (Italics added.)

Ordaz contends that the italicized word "crimes" improperly allowed "consideration of all gang evidence on every charged crime" because the term " 'gang activity' is very broad and . . . every count was alleged to be gang-related."[2] (Italics omitted.) He also faults the instruction because it did not say that the jury "could not consider other crimes or gang activities that were not at least proven to a preponderance (or beyond a reasonable doubt if they are essential to guilt . . .)."

Although CALCRIM No. 1403 did not refer to the prosecution's burden of proof, that burden was adequately addressed in other instructions. The jury was instructed pursuant to CALJIC No. 2.80 that an expert's opinion "is only as good as the facts and reasons upon which it is based," and that "[i]f you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion."

_____

[2] During the gang expert's testimony, the court gave a limiting instruction that did not include the challenged language. The first paragraph of that previous instruction stated: "You may consider evidence of gang activity only for the limited purpose of deciding whether, one, the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements and special circumstance allegations that are charged, and in deciding whether the defendant had a motive to commit the crimes charged, that would be two counts of murders and one count of shooting into an occupied vehicle."

23

Moreover, the court instructed pursuant to CALJIC No. 2.90 that the People were required to prove Ordaz's guilt beyond a reasonable doubt.

Ordaz says that CALCRIM No. 1403 "posed a serious risk of unfair use of tempting but improper evidence to shore up" the prosecution's case on the murder and vehicle-shooting counts, which the jury could have considered "gang-related crimes" because they had gang enhancements. He argues as if inclusion of the word "crimes" in the final version of the instruction opened the door to use of all of the expert testimony about gangs against him on all of the issues associated with those offenses, but that is not true.

The instruction limits the use of gang activity only to prove "intent, purpose, and knowledge." (CALCRIM No. 1403.) No issues of knowledge were presented, and the gang evidence could properly be considered as proof of the purpose of the crimes (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 [gang evidence is relevant and admissible when motive for crime is gang-related]). The murder counts raised issues of specific intent. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1132; compare *People v. Ramirez* (2009) 45 Cal.4th 980, 985, fn. 6 [shooting at an occupied vehicle is a general intent crime].) However, we are not persuaded that even the most potentially inflammatory gang evidence—Ordaz's prior assault, and the murder and manslaughter committed by other gang members—could have caused the jury to find that Malero's murder was willful, deliberate, and premeditated, or that Mejia's murder was intentional, if they otherwise had reasonable doubt. The case for those findings was based on the circumstances of the killings, not on the predicate offenses introduced to prove a pattern of gang activity by the Border Brothers. Ordaz was not prejudiced by the word "crimes" in the last version of the limiting instruction.

(3) Aiding and Abetting Instruction

Ordaz contends that his conviction for second degree murder of Mejia must be reversed because the court erroneously instructed on aiding and abetting liability. Mejia died from multiple gunshot wounds, no single one of which could be specified as the cause of death. The prosecution argued that Ordaz was guilty of Mejia's murder as an

24

aider and abettor because Ordaz instigated the fatal rain of bullets from gang members, even if none of the bullets fired by Ordaz struck Mejia.

The jury was instructed pursuant to CALJIC No. 3.01 that "A person aids and abets the commission or attempted commission of a crime when he or she, one, with knowledge of the unlawful purpose of the perpetrator, and, two, with the intent or purposed of committing or encouraging or facilitating the commission of the crime, and, three, by act or advice or by failing to act in a situation where a person has a legal duty to act, aids, promotes, encourages or instigates the commission of a crime." The court also instructed pursuant to former CALJIC No. 3.00: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, is *equally guilty*. Principals include those who directly and actively commit or attempt to commit the act constituting the crime, or those who aid and [abet] the commission or attempted commission of the crime." (Italics added.)

Ordaz contends that it was error in this case to instruct the jury that principals are equally guilty because, as stated in the Use Note to current CALJIC No. 3.00, "in a murder or attempted murder prosecution, not involving felony-murder or the natural and probable consequences doctrine, the guilt of an aider and abettor may be equal to, greater or less than that of the actual perpetrator depending upon the mens rea of the aider and abettor." (*Ibid.*, citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1114, and *People v. Samaniego, supra,* 172 Cal.App.4th at p. 1164.) Under CALJIC No. 3.00 as currently used in murder cases, the words "equally guilty" have been replaced by "guilty of a crime," and the following language is added: "When the crime charged is . . . murder . . . the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person's own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly, the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state."

25

Defendant Salmaniego, like Ordaz, sought to overturn his murder convictions because his jury was instructed under former CALCRIM No. 400 that " '[a] person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.' " (*People v. Salmaniego*, *supra*, 172 Cal.App.4th at p. 1163.) The court found the argument was forfeited. "Generally, ' "[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' [Citations.] . . . CALCRIM No. 400 is generally an accurate statement of law, though misleading in this case. Samaniego was therefore obligated to request modification or clarification and, having failed to have done so, forfeited this contention." (*Ibid.*) We reach the same conclusion here.

It is significant that the "equally guilty" language was at least partially correct in the circumstances of this case because Ordaz could be found to have been both a perpetrator and an aider and abettor of Mejia's killing. "When two or more persons commit a crime together, both may act in part as the actual perpetrator and in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1120.) In such a situation, "[t]he aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." (*Ibid.*)

In context, the error Ordaz identifies was harmless under any standard. He suggests that the jury might have used the instruction to avoid grappling with his claim of unreasonable self-defense. However, no evidence or argument was presented about the mental states of the other shooters, and any finding that their mens rea was more culpable than Ordaz's would have been sheer speculation. Moreover, "[a]ider and abettor liability is premised on the combined acts of all the principals" (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1120), which, in this case, included at least 15 shots fired at Mejia, not just the two fired by Ordaz. The evidence for implied malice was overwhelming.

26

(4) <u>Multiple-Murder Special Circumstance Instruction</u>

Ordaz argues that the multiple-murder special circumstance finding must be reversed because the jury was not instructed that it had to determine that Ordaz intended to kill Mejia as well as Melero-Smith in order to find that special circumstance. This contention fails because our Supreme Court recently confirmed that the multiple-murder special circumstance does not require a finding the defendant intended to kill more than one victim. (*People v. Maciel* (2013) 57 Cal.4th 482, 521, citing *People v. Rogers* (2006) 39 Cal.4th 826, 892.)

(5) <u>Voluntary Manslaughter Instructions</u>

Ordaz argues that his murder convictions must be reversed because the jury was improperly instructed on unreasonable self-defense voluntary manslaughter.

The jury was instructed under CALJIC No. 8.40 ("Voluntary Manslaughter—Defined"): "Every person who unlawfully kills another human being without malice aforethought but either with an intent to kill or with conscious disregard for human life is guilty of voluntary manslaughter in violation of Penal Code section 192(a). [¶] There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the actual but unreasonable belief of the necessity to defend oneself against imminent peril to life or great bodily injury."

The jury was also instructed under CALJIC No. 8.50 ("Murder and Manslaughter Distinguished"): "The distinction between murder and manslaughter is that murder requires malice while manslaughter does not. When the act causing the death though unlawful is done in the heat of passion or is excited by a sudden quarrel that amounts to adequate provocation or in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, the offense is manslaughter. [¶] In this case even if an intent to kill exists the law is that malice, which is an essential element of murder, is absent. To establish that a killing is murder and not manslaughter the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or

27

upon sudden quarrel or in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury."

Although the jury was thus repeatedly instructed that imperfect self-defense requires an actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, Ordaz contends that the court was required to further define the concept by giving either CALJIC No. 5.17 or CALCRIM No. 571.

CALJIC No. 5.17 ("Actual But Unreasonable Belief in the Necessity to Defend") states in relevant part: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. . . . [¶] As used in this instruction, an 'imminent' peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer." (Brackets omitted.)

CALCRIM No. 571 ("Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another—Lesser Included Offense (Pen. Code, § 192)") states in relevant part: "The difference between complete self-defense . . . and imperfect self-defense . . . depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense . . . if: [¶] 1. The defendant actually believed that he . . . was in imminent danger of being killed or suffering great bodily injury; AND [¶] The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; BUT [¶] 3. At least one of those beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] . . . [¶] *Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." (Parentheses and brackets omitted.)

28

The voluntary manslaughter instructions given to the jury under CALJIC Nos. 8.40 and 8.50 were correct, and CALJIC No. 5.17 or CALCRIM No. 571 would have merely elaborated on them. But Ordaz forfeited his argument that the elaboration was necessary by failing to request the instructions at trial. (*People v. Salmaniego*, *supra*, 172 Cal.App.4th at p. 1163 [instruction correct in law and responsive to the evidence cannot be challenged as too general or incomplete unless appropriate clarifying or amplifying language was requested].) Ordaz cites CALJIC and CALCRIM Use Notes for the proposition that the court was required to provide the elaboration sua sponte, but authorities cited in the Use Notes merely direct that unreasonable self-defense instructions be given when justified by the evidence. (E.g., Use Note to CALCRIM No. 571, citing *People v. Barton*, *supra*, 12 Cal.4th at p. 201.)

Moreover, again, no prejudice can be shown. The concepts set forth in CALJIC No. 5.17 and CALCRIM No. 571 are subsumed in the language of CALJIC Nos. 8.40 and 8.50 requiring an "actual but unreasonable belief in the necessity to defend . . . against imminent peril to life or great bodily injury." The outcome would not have been different if the jury had been told that Ordaz's "actual" beliefs depended on the "circumstances as they were known and appeared to [him]" (CALCRIM No. 571), that "imminent peril" meant danger that was "immediate and must be instantly dealt with" (CALJIC No. 5.17), or that "great bodily harm" meant "significant or substantial physical injury" (CALCRIM No. 571).

D. Sentencing

The court imposed determinate sentences of two years and eight months on the two counts of possession of a firearm by an ex-felon (counts three and five), respectively. For the murder of Melero-Smith (count four), the court imposed a consecutive sentence of 50 years to life (Pen. Code, §§ 190, subd. (a) [25-to-life for first degree murder], 12022.53, subd. (d) [25-to-life for the firearm enhancement]) without possibility of parole (Pen. Code, § 190.2, subds. (a)(3), (a)(22) [multiple-murder and gang special circumstances]). For the murder of Mejia (count one), the court imposed a consecutive sentence of 40 years to life (Pen. Code, §§ 190, subd. (a) [15-to-life for second degree

murder], 12022.53, subd. (d) [25-to-life for the firearm enhancement]) without possibility of parole (Pen. Code, § 190.2, subd. (a)(3) [multiple-murder special circumstance]). The sentence for shooting into an occupied vehicle (count two) was stayed. (Pen. Code, § 654.)

Ordaz contends, the People do not dispute, and we agree that the sentences were erroneous in two respects. First, the court should not have imposed 25 years to life in addition to life without possibility of parole for the first degree murder of Melero-Smith because those are alternative sentences for first degree murder. (Pen. Code, § 190, subd. (a) [first degree murder is punishable "by death, imprisonment in the state prison for life without the possibility of parole, *or* 25 years to life" (italics added)].) The correct sentence for the first degree murder (without the firearm enhancement) was simply life without possibility of parole. Second, the court should not have imposed a sentence of life without possibility of parole, based on the multiple-murder special circumstance, for the second degree murder of Mejia. (Pen. Code, § 190.2, subd. (a) [sets forth special circumstances "for a defendant who is found guilty of murder in the first degree"].) This case is not one of the limited situations in which life without possibility of parole can be imposed for second degree murder. (E.g., Pen. Code, § 190, subd. (c) [murder of a peace officer in specified circumstances].) The correct sentence for the second degree murder was simply 40 years to life.

The abstract of judgment erroneously lists multiple-murder and gang "LWOP" enhancements to the count one sentence for Mejia's murder, which must be stricken.

### III. DISPOSITION

The sentence on count one is modified to 40 years to life, consisting of 15 years to life for second degree murder (Pen. Code, § 190, subd. (a)), plus 25 years to life for use of a firearm (Pen. Code, § 12022.53, subd. (d)). The sentence on count four is modified to life without possibility of parole for first degree murder (Pen. Code, § 190, subd. (a)), plus 25 years to life for use of a firearm (Pen. Code, § 12022.53, subd. (d)). As so modified, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment

30

striking the special circumstances enhancements (Pen. Code, § 190.2, subds. (a)(3), (a)(22)) for count one.

_____
Siggins, J.

We concur:

_____
Pollak, Acting P.J.

_____
Jenkins, J.

31